RANDALL, Circuit Judge:
 

 This case involves a dispute between two claimants to a fund interpleaded by United Parcel Service, Inc. (UPS). UPS hired Weben Industries, Inc. (Weben), a general contractor, to do construction work at its facilities in several states. Weben in turn hired Conveyor, Machinery & Steel Erectors, Inc. (CoMaster), a subcontractor, to do work at the UPS facility in Atlanta, Georgia. Weben declared bankruptcy under Chapter 11 of the Bankruptcy Code. At the time of Weben’s bankruptcy, UPS still owed money under the various construction contracts, so UPS filed an interpleader action and placed the money it owed into the registry of the court. This case involves a dispute between two parties claiming entitlement to the interpleaded fund. The district court granted judgment in favor of one of Weben’s creditors, Mercantile National Bank at Dallas, holding that the Bank’s perfected security interest in Web-en’s accounts receivable took priority over CoMaster’s entitlement to the fund, 610 F.Supp. 13. We reverse and remand.
 

 I.
 

 UPS hired Weben, a general contractor, to construct and install a conveyor system at UPS’s facility in Atlanta, Georgia. This agreement was executed on April 26, 1982. On May 10, 1982, Weben hired CoMaster, the subcontractor, to assemble and install the system in Atlanta for UPS.
 

 Mercantile National Bank at Dallas and Mercantile Dallas Corp. (collectively “the Bank”) had made a number of loans to Weben between 1977 and 1982, and had granted to Weben a line of credit. As consideration, Weben executed interest-bearing promissory notes in favor of the Bank. In addition, the Bank received a security interest, which has been duly perfected, in Weben’s accounts receivable existing on or arising after August 22, 1975.
 

 On September 10, 1982, before CoMaster had completed the work on the UPS Atlanta facility, Weben filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code. CoMaster had previously submitted two invoices to Weben, but CoMaster had not been paid. Consequently, on September 17,1982, CoMaster filed a materialman’s lien against the UPS facility in Atlanta. Faced with the existence of several liens against its properties,
 
 [1]
 
 as well as demands from the Bank that it was
 
 *1007
 
 entitled to the money UPS owed to Weben, UPS sought to interplead the money which it owed under the various construction contracts.
 

 The Bankruptcy Court for the Northern District of Texas, the court where Weben had filed its Chapter 11 petition, signed an order on September 21, 1982, authorizing UPS to obtain performance from CoMaster for completion of the Atlanta facility.
 
 [2]
 
 In addition, the order provided:
 

 that in the event any such contract shall be completed prior to further order of this Court, the amounts due under such contract, less the costs incurred by United Parcel Service, Inc. upon completion of such contract shall be paid by United Parcel Service, Inc. into the Registry of the Court, such proceeds to be first distributed in satisfaction of valid liens existing by reason of state laws against properties of United Parcel Service, Inc. or its subsidiaries or affiliates and attributable to such contracts to protect artisans, mechanics and materialmen, and the balance in satisfaction of such other liens and claims as may exist_
 

 This order was entered on October 5, 1982. On November 15, 1982, the bankruptcy court signed another order, entered on November 24, 1982, which authorized UPS to file an interpleader action in the United States District Court for the Northern District of Texas “for the purpose of adjudicating any claims or potential claims against funds held by United Parcel Service, Inc. as to various contracts with [Weben] for the installation of conveyor systems and car washes in various locations.” UPS subsequently filed the inter-pleader action and indicated that $358,-449.33 was due on the Atlanta facility. Co-Master claims that it is entitled to $131,-886.15, plus interest, of that amount.
 

 II.
 

 Both the Bank and CoMaster claim entitlement to the interpleaded fund. The Bank argues that the interpleaded fund is an “account receivable” of Weben, in which the Bank has a perfected security interest which is prior to CoMaster’s materialman’s lien (if such a lien exists at all).
 
 [3]
 
 CoMaster argues that the interpleaded fund is not an account receivable of Weben but is instead a construction trust fund which must be used to pay the various subcontractors to which UPS is, in effect, indebted.
 

 The district court granted the Bank’s motion for summary judgment, holding that the “support for a construction trust fund doctrine in the Georgia law ... finds expression only in older cases decided before enactment of the Georgia Uniform Commercial Code.”
 
 United Parcel Service, Inc. v. Weben Industries,
 
 610 F.Supp. 13, 15 (N.D.Tex.1985). The court concluded “that a Georgia court would decline, absent express statutory authority, to impose a construction trust on the contract fund involved here.”
 
 Id.
 
 at 16. The district court then assumed that CoMaster’s material-man’s lien on the UPS facility was valid, but the court held that, under Georgia law, the Bank’s perfected security interest in Weben’s accounts receivable took priority over CoMaster’s lien. Accordingly, the district court awarded the interpleaded fund to the Bank.
 

 The district court suggested, and the Bank urges on appeal, that the cases expressing support for the construction trust fund theory under Georgia law are no longer persuasive authority since they were, by and large, decided before the enactment of the Georgia UCC. On the contrary, Co-Master argues that expressions favoring the construction trust fund doctrine have continued even since the passage of the UCC. We conclude that CoMaster is correct, and that under the terms of the con
 
 *1008
 
 tract between UPS and Weben, as well as under the trust fund doctrine, CoMaster is entitled to compensation for the work it performed on the UPS facility in Atlanta even prior to Weben's bankruptcy.
 

 III.
 

 Shortly after Weben filed its bankruptcy petition, the Bank demanded that UPS pay to it the money due Weben as of the date of the bankruptcy filing, “including the amounts due to Weben under their agreement for construction of the Georgia facility.” Bank’s brief at 5-6. However, it is axiomatic that the Bank, as an assignee of Weben’s accounts receivable (assuming, arguendo, that Weben’s “right to payment” from UPS is an account receivable of Weben), stands in no better position vis-a-vis UPS than does Weben itself.
 
 See generally
 
 Clark,
 
 The Law of Secured Transactions Under the Uniform Commercial Code,
 
 ¶¶ 11.4,11.5 (1980); Ga. Code Ann. § 11-9-318. Consequently, in order to evaluate the Bank’s entitlement to the interpleaded fund, we must examine the construction contract between Weben and UPS. Article 5 of the agreement, entitled “Waiver of Liens,” provides as follows:
 

 CONTRACTOR for itself and its subcontractors, material suppliers and employees, hereby expressly waives the right to file any lien or claim against the premises; and further, that
 
 if in violation thereof, there shall be any lien, or other claim for monies due or to become due for which if established, UPS might be liable, and which would be chargeable to the CONTRACTOR, CONTRACTOR shall immediately satisfy or bond the same, or UPS shall have the right to bond said lien or claim or otherwise discharge the same and to retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify it against such lien or other claim with interest together with the expense incident to discharging such lien
 
 or claim or defending suit to enforce such lien or other claim, including any premiums charged for a bond and any attorney’s fees and disbursements all of which the CONTRACTOR agrees to pay....
 

 (emphasis added). Under this agreement, once CoMaster filed a lien against the UPS property and thereby asserted a claim for monies due for which UPS might be liable, then, irrespective of the lien’s validity
 
 {see supra
 
 note 3), UPS was authorized to discharge CoMaster’s claim out of the retain-age. Accordingly, under the UPS-Weben contract, Weben had no right to payment from UPS of the amount required to discharge CoMaster’s claim. This contractual authority to withhold payment from Weben and to pay CoMaster, moreover, is buttressed by the construction trust fund doctrine.
 

 The Georgia Supreme Court has not discussed the effect of the Georgia UCC on the viability of the construction trust fund theory under Georgia law. Nor have we located any reported opinion of a lower Georgia court discussing this issue. Our
 
 Erie-role
 
 is to apply existing Georgia law, not to adopt innovative theories for the state.
 
 Jackson v. Johns-Manville Sales Corp.,
 
 781 F.2d 394, 396-98 (5th Cir.1986) (en banc). When making an
 
 Erie-gness
 
 in the absence of explicit guidance from the state courts, we must attempt to predict state law, not to create or modify it.
 
 Id.
 

 In some states, the construction trust fund doctrine has been codified expressly by state law.
 
 See, e.g., Selby v. Ford Motor Co.,
 
 590 F.2d 642 (6th Cir.1979) (interpreting Michigan law);
 
 Carrier Corp. v. J.E. Schecter Corp.,
 
 347 F.2d 153 (2d Cir.),
 
 cert. denied,
 
 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965) (interpreting New Jersey law);
 
 cf. Georgia Pacific Corp. v. Sigma Service Corp.,
 
 712 F.2d 962 (5th Cir.1983) (interpreting Arkansas and Mississippi law and concluding that statutes do not authorize construction fund theory). In other states, the construction trust fund theory has been based primarily on equitable principles; although state law has been relied upon by the courts as general support for the doctrine, it has been developed despite the absence of laws explicitly
 
 *1009
 
 establishing the theory.
 
 See, e.g., United States v. Durham Lumber Co.,
 
 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960) (North Carolina law);
 
 Keenan Pipe & Supply Co. v. Shields,
 
 241 F.2d 486, 489 (9th Cir.1956);
 
 Mickelson v. Aetna Casualty & Surety Co.,
 
 452 F.2d 1219, 1225 (8th Cir.1971);
 
 In re D & B Electric, Inc.,
 
 4 B.R. 263 (Bankr.W.D.Ky.1980) (Kentucky law).
 

 If the construction trust fund theory is valid in Georgia, it must be by virtue of equitable principles and indirect statutory support, for Georgia has no statute which expressly codifies the trust fund theory. Nevertheless, this court has previously held, in a decision which was rendered before the enactment of the Georgia UCC,
 
 [4]
 
 that when “the owner deposits in the bankruptcy court the unexpended balance of the [construction] contract price, he deposits it to the extent necessary to discharge the liens,
 
 not as money of the estate, but as money of the lien claimants.” Cutler-Hammer, Inc. v. Wayne,
 
 101 F.2d 823, 825 (5th Cir.),
 
 cert. denied,
 
 307 U.S. 635, 59 S.Ct. 1031, 83 L.Ed. 1517 (1939) (emphasis added). The Bank contends that reliance on
 
 Cutler-Hammer
 
 as support for the construction trust fund theory is inapt, as that case involved a dispute between a subcontractor’s materialman’s lien and a general unsecured creditor. This observation is correct but irrelevant. The critical issue resolved by
 
 Cutler-Hammer
 
 was that the money deposited into the court never becomes part of the debtor’s estate; it therefore matters not whether a creditor of the estate is secured or unsecured, as neither will have a claim to that which never enters the estate.
 

 The more difficult issue is whether the construction trust fund theory sketched by this court in
 
 Cutler-Hammer
 
 remains viable under Georgia law following the enactment of the Georgia UCC. We conclude that it does. Support for the equitable principles which undergird the theory appears in numerous decisions of the Georgia courts, both pre- and post-1978. For example, in
 
 Short & Paulk Supply Co. v. Dykes,
 
 120 Ga.App. 639, 171 S.E.2d 782 (1969), the court, after observing that “[i]t is the owner’s [i.e., UPS’s] responsibility to see to it that the payments which he makes on the construction contract price are properly disbursed by the contractor to those having valid claims for labor and materials,”
 
 id.,
 
 171 S.E.2d at 786, expressly embraced the trust fund doctrine:
 

 If he [the contractor] received the full contract price for the job he became a trustee of the funds for the purpose of disbursing them properly to those who held valid claims for labor and materials....
 

 Id.
 
 at 788. Similarly, in
 
 Scott v. Williams,
 
 111 Ga.App. 735, 143 S.E.2d 16 (1965), the court stressed the owner’s obligation to insure that the subcontractors get paid by the general contractor. Indeed, while claims of the subcontractors remain outstanding, the owner is entitled to withhold payment from the general contractor.
 
 Id.,
 
 143 S.E.2d at 18.
 
 [5]
 
 In addition the court observed that the purpose of the Georgia lien statute is to “secur[e] the payment of the contract price, and creat[e] the fund out of which the subcontractors and laborers may be paid.”
 
 Id.
 
 at 17.
 

 The duty of the owner to insure that the subcontractors get paid has apparently not been affected by the 1978 amendments to the Georgia UCC.
 
 See, e.g., Jones Mercantile Co. v. Lyn-Har, Inc.,
 
 245 Ga. 812, 267 S.E.2d 251 (1980);
 
 Henderson v. Mitch
 
 
 *1010
 

 ell Engineering Co.,
 
 158 Ga.App. 306, 279 S.E.2d 750, 752 (1981);
 
 Arrington v. Andrews,
 
 152 Ga.App. 572, 263 S.E.2d 491, 492 (1979). This frequent reiteration of the right of the subcontractors to be paid is especially important because it is this fundamental obligation to subcontractors and materialmen which has largely supported the development of the construction trust fund, theory in states where there is no explicit statutory authorization.
 
 See, e.g., In re Tonyan Construction Co.,
 
 28 B.R. 714, 724-25 (Bankr.N.D.Ill.1983) (Illinois law imposing criminal sanctions for general contractor’s failure to pay funds due to subcontractors and “principles of equity and justice” support conclusion that money deposited into the court is a trust fund for the benefit of subcontractors.);
 
 In re D & B Electric, Inc.,
 
 4 B.R. 263 (Bankr.W.D.Ky.1980) (“In Kentucky, there is no common law support for the [construction trust fund theory]. However, support for such a claim may derive from a statutory provision ... requiring contractors to pay in full all materialmen from funds they receive from the owner.”);
 
 Citizens Fidelity Bank & Trust Co. v. Fenton Rigging Co.,
 
 522 S.W.2d 862 (Ky.Ct.App.1975). Moreover, the court in
 
 Fenton
 
 emphasized that the owner’s obligation to pay the subcontractors effectively removes the money owing to the subcontractors from the general contractor’s accounts receivable;
 
 [6]
 
 since the general contractor has no valid claim to the money, the general contractor’s creditors, secured or not, likewise may stake no claim.
 
 Id.
 
 at 863;
 
 see also Aquilino v. United States,
 
 10 N.Y.2d 271, 219 N.Y.S.2d 254, 262, 176 N.E.2d 826, 832 (1961) (“Our conclusion, then, is that ... a contractor does not have a sufficient beneficial interest in the moneys, due or to become due from the owner under the contract, to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid.”)
 

 The construction trust fund theory and the owner’s duty to insure that the subcontractors get paid have been firmly rooted in Georgia law not only by state courts but by federal district courts in Georgia as well.
 
 See, e.g., Mullins v. Noland Co.,
 
 406 F.Supp. 206, 212-14 (N.D.Ga.1975). While it is true that many of the decisions expressing support for the construction trust fund theory pre-date the 1978 amendments to the Georgia UCC, the significance of that fact is not clear. Furthermore, and of central importance to this EWe-court, there is no reported Georgia authority indicating that Georgia law has now changed. Absent an express indication from either the Georgia courts or legislature that the law in Georgia has been altered, it is not our role to jettison the construction trust fund doctrine.
 
 Jackson,
 
 781 F.2d at 397. Although the Bank asserts that the priority scheme established in section 9-310 of the Georgia UCC — giving a bank’s perfected security interest priority over a materialman’s lien — somehow renders the trust fund theory obsolete, the Bank does not explain why this is so. Significantly, the Bank cites no support for this novel proposition, and there is neither legislative history nor Georgia authority amplifying the Bank’s view. Just as plausibly, the priority structure established in section 9-310 is intended to govern the situation where the contractor and the bank are battling over the assets of the same account debtor.
 
 See, e.g., Newton Ford Tractor Co. v. J I Case Credit Corp.,
 
 163 Ga.App. 497, 294 S.E.2d 723 (1982).
 

 We conclude that principles of Georgia law, as expressed by various decisions of the Georgia courts, support the viability of the construction trust fund theory under Georgia law. The notion that this doctrine has been abrogated by the Georgia UCC or its amendments is a novel theory which finds no support in the Georgia law.
 

 IV.
 

 In summary, we hold that under the UPS-Weben contract, UPS was authorized
 
 *1011
 
 to withhold payment from Weben of the amount necessary to discharge CoMaster’s claim, and that the Bank had no greater right to that payment than did Weben. We hold further that CoMaster was entitled, under the construction trust fund theory, to payment for amounts due from Weben to CoMaster from the interpleaded fund.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . CoMaster was not the only lien claimant. Other subcontractors hired by Weben to do work on other UPS facilities in different states had also filed liens against the UPS properties on which they had worked.
 

 [2]
 

 . The order authorized UPS to obtain performance from all the subcontractors hired by Web-en.
 

 [3]
 

 . The Bank argues that CoMaster agreed to waive its statutory right to assert any liens against the UPS property. The district court decided this case without determining whether CoMaster’s purported lien is valid. We too have no occasion to reach this issue.
 

 [4]
 

 . The Georgia UCC became effective on January 1, 1964. Section 9-310 of the Georgia UCC, Ga.Code Ann. § 11-9-310, was amended in 1978 to provide that a perfected security interest in collateral takes priority over all liens enumerated in Ga.Code Ann. § 67-1701 (presently codified as Ga.Code Ann. § 44-14-320), which includes materialmen’s liens on real property. This amendment is significant in that the Bank maintains that it evinces the Georgia legislature’s intention to annul the construction trust fund doctrine, at least insofar as secured creditors are concerned. As we indicate in the text, there is no basis for inferring this intention from the 1978 amendments.
 

 [5]
 

 . Parenthetically, we note that this provision of Georgia law is embodied in the UPS-Weben contract.
 

 [6]
 

 .
 
 Cf. Sterling National Bank & Trust Co. v. Southwire Co.,
 
 713 F.2d 684 (11th Cir.1983) (account receivable under Georgia law is a right to payment);
 
 In re Barnes Freight Line, Inc.,
 
 29 B.R. 664 (Bankr.N.D.Ga.1983).