**AMERICAN WASTE & POLLUTION CONTROL COMPANY, Plaintiff–Appellant,**

v.

**BROWNING–FERRIS, INC., Defendant–Appellee.**

**No. 90–4639.**

United States Court of Appeals, Fifth Circuit.

Dec. 23, 1991.

Rehearing Denied Jan. 29, 1992.

John G. Torian, II, Bert Wilson, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for plaintiff-appellant.

Harry S. Hardin, III, Judith V. Windhorst, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant-appellee.

Before BROWN, JOHNSON and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

In this Louisiana diversity action, American Waste & Pollution Control Company appeals the district court's Fed.R.Civ.P. 12(b)(6) dismissal, contending that it has stated claims for both tortious interference with contract and violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La.Rev.Stat.Ann. § 51:1401, et seq. (West 1987) (UTPCPL). We AFFIRM.

## I.

In January 1990, American Waste brought suit against Browning–Ferris, Inc. (BFI), seeking damages for the two foregoing claims and unjust enrichment. The complaint alleged that: the Jefferson Davis Parish Sanitary Landfill Commission was created in 1984 to construct and operate the parish landfill; in early 1987, the Commission began the process of receiving bids for the operation of the landfill, which was under construction; although bid specifications were submitted to several operators, including American Waste and BFI, American Waste was the only bidder; in November 1987, the Commission entered into a long-term agreement with American Waste, which included conditions to be satisfied by the Commission before the agreement became effective; the Commission and American Waste entered into an interim agreement to allow American Waste to operate the site, pending implementation of the long-term agreement; and after entering into the interim agreement, and in reliance on the long-term agreement, it further developed, and otherwise operated, the landfill and, in conjunction with the Commission, prepared permit modifications which were submitted to, and in part later ratified by, the Department of Environmental Quality.

American Waste further alleged that in January 1989, BFI, with knowledge of the contract between American Waste and the Commission, submitted proposals to the Commission for the operation of the landfill; and that in 1989, while American Waste and the Commission were negotiating amendments to their agreements and American Waste was operating the landfill, BFI also "offered substantial sums of money and other incentives to the COMMISSION in order to induce the COMMISSION to completely repudiate its agreement and contractual relations with AMERICAN WASTE."

The complaint further alleged that: the long-term and interim agreements had "been the subject of litigation between the Jefferson Davis Parish Police Jury, the COMMISSION, the Town of Welsh and AMERICAN WASTE"; in May 1989, a Louisiana court "held that the agreements were invalid," because they "required the COMMISSION to turn over the day to day control over the landfill to AMERICAN WASTE without unanimous consent of the governmental bodies which [made] up the COMMISSION"; this ruling was contrary to the agreements, which state that the Commission was to maintain such day-to-day control; and in July 1989, after the state court removed American Waste, the Commission entered into an agreement with BFI to operate the landfill.

In count one of its complaint, American Waste alleged that BFI's actions "constitute[d] an intentional, unjustified and improper interference with contractual relations"; and that, as a result of this interference, the Commission breached its agreements with American Waste, causing injury to American Waste. American Waste also alleged that BFI was unjustly enriched at the expense of American Waste as a result of the intentional interference.

In the second count, American Waste alleged that during the pendency of the state litigation, the parties to it had reached an informal settlement agreement in January 1989; and that BFI, "with full knowledge that American Waste and the COMMISSION were negotiating amendments to their existing agreements, intentionally offered substantial sums of money,

in excess of [$5 million], and other incentives to the COMMISSION in order to induce the COMMISSION to withdraw from these settlement negotiations and to completely repudiate its agreement and contractual relations with AMERICAN WASTE," causing the settlement to fail.

In the third count, American Waste alleged that BFI's conduct violated the UTPCPL.

Pursuant to Rule 12(b)(6), BFI moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The magistrate judge issued a report and recommendation that (1) Louisiana law did not recognize BFI's conduct as actionable under its law of intentional interference with contract, because the Louisiana case which had recently recognized the doctrine, *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989), and the cases following it, did not extend the doctrine to the facts as alleged by American Waste; (2) BFI's actions did not provide a cause of action under the UTPCPL, because the alleged wrongful conduct did not constitute a statutory unfair trade practice; and (3) American Waste could not bring a claim for unjust enrichment, because it had not alleged all of the elements for that cause of action and the claim, if any, would lie against a party other than BFI.[1]

In response to the recommendation, American Waste filed objections and a supporting memorandum in district court, to which BFI responded. "[A]fter an independent review of the record and a de novo determination of the issues," the district court held that the findings in the recommendation were correct and dismissed the action.

## II.

■ Of course, in reviewing a Rule 12(b)(6) dismissal, the court must accept as true all well-pleaded averments and view them in the light most favorable to the plaintiff. Moreover, "we may uphold ... [a Rule 12(b)(6) dismissal] only if it appears that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir. 1986) (citation omitted). And, as recently held by the Supreme Court, we "review *de novo* a district court's determination of state law." *Salve Regina College v. Russell*, 499 U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).[2]

"When presented with an unsettled point of state law, our role under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), is to determine how the [Louisiana] Supreme Court would resolve the issue if presented to it." *Coatings Mfrs., Inc. v. DPI, Inc.*, 926 F.2d 474, 479 (5th Cir.1991). In addition, "[w]hen making an *Erie*-guess in the absence of explicit guidance from the state courts, we must attempt to predict state law, not to create or modify it." *United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1008 (5th Cir.1986) (citing *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 396–98 (5th Cir.1986) (en banc)). "[W]e are not free to fashion new theories of recovery under Louisiana law." *Pittman v. Dow Jones & Co.*, 834 F.2d 1171, 1171 (5th Cir. 1987).

## A.

■ In *Spurney*, the Louisiana Supreme Court recognized a very narrow cause of action for tortious interference with contracts. The Louisiana World Exhibition, Inc. (LWE), contracted with 9 to 5 Fashions to supply uniforms for the fair employees. After the fair, 9 to 5 was unable to collect under the contract, be-

---

1. American Waste does not appeal the dismissal of its unjust enrichment claim. As noted, it contends here only that "[t]he complaint states a claim [1] for tortious interference with contracts and contractual relations" and (2) "under the Louisiana Unfair Trade Practices [and Consumer Protection Law]."

2. *Salve Regina College* overruled our prior rule by which this court "customarily defer[red] to the district judge in a diversity case involving interpretation of the law of the state in which the judge sits." *USX Corp. v. Tanenbaum*, 868 F.2d 1455, 1457 (5th Cir.1989).

cause LWE was in bankruptcy. 9 to 5 sued Spurney, CEO of LWE, alleging that he had damaged 9 to 5 by intentional and negligent interference that hindered its performance of the contract.

Initially, the court noted that 9 to 5 wanted it "to recognize an action that it has refused to allow since 1902, viz., an action for tortious interference with a contractual relationship." 538 So.2d at 231. In addressing the issue, the court noted:

> It is the basic policy of our law that every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it. La. Civ.Code art. 2315. The framers conceived of *fault as a breach of a preexisting obligation* for which the law orders reparation, when it causes damage to another, and they *left it to the courts to determine in each case the existence of an anterior obligation which would make an act constitute fault.* 2 M. Planiol, Treatise on the Civil Law, Part 1, §§ 863–865 (1959); *Pitre v. Opelousas General Hosp.,* 530 So.2d 1151 (La.1988).

538 So.2d at 231 (emphasis added). Pursuant "to these basic principles," the court held

> that, in light of modern empirical considerations and the *objectives of delictual law,* an officer of a corporation owes an *obligation* to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has a reasonable justification for his conduct.

*Id.* (emphasis added).

The court noted that its holding was "derived from the contemporary doctrine of interference with contractual relations existing in other jurisdictions," which it found "consistent with civilian delictual principles and implemental of present day moral, social and economic values." *Id.* at 231–32. Noting the distinction between negligence and an intentional tort, the court held that

a corporate officer should be free "to fully perform his fiduciary duty as authorized by his corporation," without "undue fear of personal liability"; but that when his "action is detrimental to the corporation or outside the scope of his authority, the officer should be responsible for his intentional acts of interference with the contract rights of another." *Id.* at 232.

In so holding, it discussed *Kline v. Eubanks,* 109 La. 241, 33 So. 211 (1902), which had been considered a bar to an action for intentional interference with contract unless the means used were unlawful. The court noted that the authorities relied on in *Kline* "have been outflanked and rendered obsolete by modern economic developments" and that Louisiana was the only state that did "not recognize [an] action for tortious interference with contractual relations." 538 So.2d at 232. The court overruled its previous decisions "barring absolutely any action based on a tortious interference with a contract" insofar as they conflicted with the *Spurney* opinion. *Id.* at 234. But, its holding was limited.

> It is not our intention, however, to adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of "a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the distinct notion that the purposes must be considered improper in some undefined way." [quoting Prosser & Keeton, The Law of Torts] Some aspects of this tort have been subjected to serious criticisms, leaving open a good many questions about the basis of liability and defense, the types of contract or relationship to be protected, and the kinds of interference that would be actionable.... In the present case we recognize ... only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.

*Id.* (citations omitted).[3]

As reflected above, the Louisiana Supreme Court in *Spurney* did not adopt

---

**3.** The court stated the elements which must be proved for this limited cause of action:

wholesale the common law tort of tortious interference with contract; however, it did not expressly preclude a cause of action on that basis based on other facts. BFI contends that the Louisiana doctrine of tortious contractual interference only applies to a corporate officer, while American Waste asserts that *Spurney* opened the door for recovery under the facts pleaded in its complaint.

In the two and one-half years since it was rendered, *Spurney*'s reach has not been expanded. *Tallo v. Stroh Brewery Co.*, 544 So.2d 452 (La.App. 4th Cir.), *writ denied*, 547 So.2d 355 (La.1989), concerned, *inter alia*, the attempted purchase of the wholesale contract of another corporation to operate a Stroh's distributorship in Louisiana. The wholesale contract with Stroh provided that it would not unreasonably withhold approval of a requested control change. Stroh refused to approve the change of control; and as a result, the contract of sale was terminated. Plaintiffs sued Stroh and its employee or agent for interference with its contractual relations. The court ruled that "[i]mplicit in those allegations is the presumption that defendants owed a duty to plaintiffs to act reasonably in considering their request for a change of control. Therefore, our inquiry is whether such a duty exists." *Id.* at 454. The court held that Stroh did not owe a duty to the plaintiffs, because Stroh had a contractual relationship only with its distributor, not with the plaintiffs. The court found no relationship—such as a third party beneficiary—giving rise to a duty and therefore dismissed for failure to state a claim, noting that *Spurney* "refused to adopt the entire expanded common law doctrine of interference with contract rights."

*Id.* at 453.[4] *See also Farrell v. Boyer*, 541 So.2d 398, 400 (La.App. 4th Cir.1989) (*Spurney* does not create a cause of action against one who interferes with another's marriage); *Butler v. Reeder*, 573 So.2d 1159, 1160 (La.App. 5th Cir.1991) (same).

In *Peacock v. Brightway Signs, Inc.*, 545 So.2d 649 (La.App. 5th Cir.), *writ denied*, 551 So.2d 636 (La.1989), the court remanded a case which apparently did not involve a corporate officer's interference with contract, but the court did not state the factual background. The case had been dismissed on the *Kline* preclusion; and the remand was for the trial court to reconsider, in light of *Spurney*, its holding that the tort of intentional interference with a contract did not exist in Louisiana. The concurring judge stated that he was of the opinion that *Spurney* "does not have the broad applicability that the majority seems to feel it does." 545 So.2d at 649.

The Louisiana Supreme Court has also applied its *Spurney* holding. In *Great Southwest Fire Ins. Co. v. CNA Ins. Cos.*, 557 So.2d 966 (La.1990), an excess liability insurer brought suit against the primary insurer, seeking recovery of sums expended due to the alleged bad faith failure of the primary insurer to defend properly and settle a lawsuit against their common insured. The opinion was penned by the author of *Spurney*. The court held that the primary insurer did "not owe a duty of care or even of good faith performance to the excess insurer"; that "if the excess insurer is to recover from the primary insurer for acts which make the excess insurer's contract and liability more burdensome, it must do so by asserting the insured's rights after becoming subrogated

---

(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Id.* at 234.

4. The concurring opinion in *Tallo* stated that although the case did not involve the same situation as *Spurney*, the concurring judge was "not convinced that the Supreme Court's recognition of a cause of action for tortious interference with contract is limited to the narrow situation presented in the case. However, if the cause of action is to be expanded, I consider it to be the Supreme Court's function to do so and not ours as an intermediate appellate court." *Id.* at 455.

to them or after acquiring them through assignment." *Id.* at 971.[5]

Even though the court noted that "bad faith" was an act requiring more intentional conduct than that necessary for finding negligence, it held that to find such a duty would result in allowing the excess insurer an action "very similar to an action for negligent interference with contract." In refusing to find the requisite duty, the court stated:

> This court recently recognized for the first time in some 87 years the possibility of a narrowly drawn action for *intentional* interference with contractual rights and indicated that it would proceed with caution in expanding that [tortious interference] cause of action. [*Spurney.*] Aside from undermining the court's resolve in that case to advance with care, recognition of a duty by the primary insurer to conduct its settlement negotiations and defense efforts in good faith so as not to cause undue risk of harm to the economic interests of the excess insurer would be unwise for independent reasons.

*Id.* at 969–70 (emphasis by court). In discussing those reasons, the court noted that interference with contract was principally an intentional tort, requiring more than negligence; that subrogation was the recognized, as well as judicially manageable, basis for recovery by insurers; and that there is "a general inhibition in negligence law against compensation for purely economic loss not the result of either bodily harm to the claimant or physical injury to property in which claimant has a proprietary interest." *Id.* at 970. Accordingly, included among its several reasons for not allowing the action (finding the duty), was the concern that the duty "would evolve to include a duty to avoid negligent interference." *Id.* at 971. *See also Herbert v. Placid Refining Co.*, 564 So.2d 371, 374 (La.App. 1st Cir.), *writ denied,* 569 So.2d 981 (La.1990) (Louisiana does not recognize a cause of action for negligent interference with contract rights).

And, in *Spencer–Wallington, Inc. v. Service Merchandise, Inc.*, 562 So.2d 1060 (La. App. 1st Cir.), *writ denied,* 567 So.2d 109 (La.1990), the court stated that "*Spurney* expressly recognized a duty on the part of a *corporate officer* not to interfere with the *corporation's* contractual relations." *Id.* at 1063 (emphasis by court). The court further found that *Spurney* "expressly refused to adopt wholesale the broad common law doctrine of tortious interference with contract." *Id.* at 1064. When Service Merchandise purchased H.J. Wilson, Inc., a contract between Wilson and the plaintiff corporation was cancelled. Plaintiffs alleged that due to the defendant's actions, the corporation had been forced out of business and the individuals had suffered injury.

The court held that "a fair reading of the Supreme Court's seminal decision [*Spurney* ] ... does not disclose a cause of action for the facts pled at bar." *Id.* at 1063. The court found that there was no legal duty that embraced the risk of harm complained of; that *Spurney* mandated that the alleged third-party breach be more than merely derivative of the duty of good faith imposed on parties to a contract under Louisiana law. *See also Frisard v. Eastover Bank for Savings,* 572 So.2d 343 (La.App. 5th Cir.1990) (tortious interference is an intentional act by a corporate officer); *Matrix Essential, Inc. v. Emporium Drug Mart, Inc.,* 756 F.Supp. 280, 284 (W.D.La. 1991) (*Spurney* "recognized only an action wherein a corporate officer causes *his own corporation* to breach a contract between *his own corporation* and the plaintiff.") (emphasis by court); *Nowling v. Aero Services Intern., Inc.,* 752 F.Supp. 1304, 1310–11 (E.D.La.1990).

*Chaffin v. Chambers,* 577 So.2d 1125 (La.App. 1st Cir.), *writ granted,* 584 So.2d 665 (La.1991) concerns facts somewhat akin to those here; a suit by one lawyer against another in tort for wrongful interference with the former's contract with his client. It was alleged that after the plaintiff lawyer had been retained and filed suit, and with knowledge that the plaintiff had

---

**5.** *See, e.g., St. Paul Ins. v. AFIA Worldwide Ins.,* 937 F.2d 274 (5th Cir.1991).

been retained, the defendant (" 'alleged to be an attorney-at-law practicing in the State of Louisiana' ") convinced the client that he could better represent him, resulting in the client's breaching the contract with plaintiff. In response to the claim that he failed to state a cause of action, plaintiff relied upon *Spurney*. After reviewing *Spurney, Great Southwest Fire Insurance Company*, and other actions discussed above, the court noted: (1) that the alleged solicitation and intentional interference were prohibited by a Louisiana Rule of Professional Conduct; (2) that a commentator had suggested that violation of the rule could result in both an action for tortious interference and an ethical complaint; (3) that the Louisiana Supreme Court had exclusive jurisdiction over regulating the practice of law and that a legislative act purporting to do so required the court's approval or acquiescence; (4) that an action for tortious interference is based on an act of the legislature (article 2315 discussed *supra* ) and that "the legislature can not enact laws regulating the practice of law *in any respect* without the approval of the Louisiana Supreme Court"; and (5) that the earlier referenced concurring opinion in *Tallo* stated that it was for the Louisiana Supreme Court, not her intermediate courts, to expand *Spurney*, if at all. *Id.* at 1128–31 (emphasis by court).

Accordingly, and without discussing whether the requisite duty existed, it held that the complaint failed to state a cause of action for intentional interference with contract. *Id.* at 1131. In so doing, it noted that the plaintiff might have a cause of action for a share of any fee recovered in the action originally filed by that plaintiff lawyer and remanded for the plaintiff to amend his complaint to attempt to state a cause of action. *Id.* at 1131. (As noted, American Waste likewise sued, *inter alia*, for unjust enrichment; but it does not assert that dismissed claim here.)

As stated, the post-*Spurney* decisions have not expanded the Louisiana law of tortious interference with contracts. The Louisiana Supreme Court has recognized the doctrine only in the limited context of a corporate officer; and to date, both it and the lower state courts have refused to extend this doctrine to other situations. *See, e.g., Jarrell v. Carter*, 577 So.2d 120, 122 n. 2 (La.App. 1st Cir.), *writ denied*, 582 So.2d 1311 (La.1991).

For our review of this Rule 12(b)(6) dismissal, we have accepted the allegations in the complaint as true and have viewed them in the light most favorable to American Waste. Having done so, we hold that Louisiana would not recognize a cause of action for tortious interference with contracts based on those facts. The common thread in *Spurney* and its progeny is the requisite duty, or obligation, for such a cause of action; a duty must exist for recovery of damages under Louisiana law, pursuant to article 2315, discussed *supra*. And whether a duty exists is a question of law. As quoted earlier from *Spurney*,

> [t]he framers [of the Civil Code] conceived of fault as *a breach of a pre-existing obligation for which the law orders reparation*, when it causes damage to another, and *they left it to the courts to determine in each case the existence of an anterior obligation which would make an act constitute fault.*

538 So.2d at 231 (citations omitted and emphasis added). *See Harris v. Pizza Hut of Louisiana, Inc.*, 455 So.2d 1364, 1371 (La. 1984) ("[d]uty is a question of law").

The requisite duty in *Spurney* arose out of a corporate officer's narrowly defined duty to those with whom his corporation contracts. The Louisiana courts have refused to find this duty, or obligation, in other circumstances, as discussed *supra*. *See, e.g., Great Southwest* (no duty of primary insurer to excess insurer); *Tallo* (no duty because no contractual relationship existed). As we construe these narrowly drawn holdings, BFI had no relationship with American Waste on which to base the requisite duty. Accordingly, in making our *Erie*-guess on this aspect of Louisiana law, and because the requisite duty is lacking, we hold that Louisiana would not allow a claim against BFI for tortious interference

with contract.[6]

In fulfilling our *Erie* role, we can only predict Louisiana state law; "[i]t is up to the Supreme Court of Louisiana and not this court to change the substantive law of that state." *Cargill, Inc. v. Offshore Logistics, Inc.,* 615 F.2d 212, 215 (5th Cir. 1980). It took the Louisiana Supreme Court almost 90 years to recognize a quite narrow cause of action for tortious contractual interference; it is not for this diversity court to expand that cause of action in the face of Louisiana's expressed unwillingness to do so.

### B.

■ The UTPCPL claim is based on the same facts as the claim for tortious interference with contract. The act states in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

La.Rev.Stat.Ann. § 51:1405. The statute provides a private cause of action for any person who suffers damage as a result of such unfair methods or practices. La.Rev. Stat.Ann. § 51:1409. American Waste contends that BFI owed it a duty to refrain from tortious contractual interference, because the UTPCPL declares unfair methods of competition and unfair or deceptive trade practices to be unlawful. However, no Louisiana court has held that UTPCPL creates a duty to refrain from such interference.

A trade practice is unfair "when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers and *consumers include business competitors.*" *Roustabouts, Inc. v. Hamer,* 447 So.2d 543, 548 (La.App. 1st Cir.1984) (emphasis added); *see also Gautreau v. Southern Milk Sales, Inc.,* 509

So.2d 495, 497 (La.App. 3d Cir.1987). Furthermore,

[a]dmittedly, the definition of what may constitute an unfair act or practice is broad and subjective. Thus, it is best that the *determination of what may amount to an unfair act or practice remain the province of the courts applied on a case by case basis.* Only in that way may the many harms sought to be proscribed by the act be prevented.

*Roustabouts,* 447 So.2d at 548 (emphasis added); *see also Moore v. Goodyear Tire and Rubber Co.,* 364 So.2d 630, 633–34 (La.App. 2d Cir.1978).

American Waste relies primarily on *Monroe Medical Clinic, Inc. v. Hospital Corp. of America,* 522 So.2d 1362 (La.App. 2d Cir.1988), decided before *Spurney.* There, the plaintiffs alleged that Hospital Corporation of America (HCA) was "providing specific economic benefits to groups of doctors who contract[ed] with them to use their facilities, and that [HCA] uses this economic leverage to influence the actions of the 'favored' physicians so as to unfairly block out or disadvantage the 'unfavored' physicians." *Id.* at 1365. The court held that the plaintiff's allegations were sufficient to state a cause of action under the UTPCPL "through the unethical and oppressive use of economic advantage to the detriment of the plaintiffs." *Id.* The court noted that although the complained of actions might simply be sound business practice in the exercise of permissible business judgment, the plaintiffs were entitled to a trial to determine whether the actions they alleged fell within the scope of the statute. *Id.*

The claim in *Monroe,* however, was not for tortious interference with contract; and no Louisiana court has considered the relationship between the UTPCPL and such interference.[7] Therefore, in our analysis of

---

6. American Waste's contention that the duty is found in the UTPCPL is discussed in section II.B.

7. Subsequent to oral argument, American Waste cited the earlier referenced *Jarrell v. Carter,* 577 So.2d 120 (La.App. 1st Cir.), *writ denied,* 582

So.2d 1311 (La.1991). There, it was held that a cause of action for an unfair trade practice had been stated. *Id.* at 124. For example, it was alleged that the party from whom Jarrell was required to obtain approval for the purchase of a company threatened to advise his financial backers that he was offering too much for the

the UTPCPL claim, we are *Erie*-bound to return to *Spurney*. Although no Louisiana court has decided whether tortious interference would constitute an unfair trade practice, it seems clear that Louisiana has decided, at least for now, that tortious interference is limited to the *Spurney* facts. *See Moore*, 364 So.2d at 634 (the collection actions of Goodyear "constituted actions which have *long been recognized in Louisiana* as unlawful ... oppressive and unscrupulous") (emphasis added). Even though the UTPCPL is broadly written, it cannot apply to activity which is not actionable under Louisiana law. Exercising our *Erie* role, and absent a preexisting duty, we hold that Louisiana would not recognize tortious interference with contract as violative of the UTPCPL.

### C.

Alternatively, American Waste requests that we certify these issues to the Louisiana Supreme Court. We decline to do so.

### III.

Accordingly, the judgment of the district court is

AFFIRMED.

---

JOHN R. BROWN, Circuit Judge, Dissenting.

I dissent as to two different matters and obviously for two different reasons.

First, I dissent from the Court's failure to apply Louisiana authoritative precedent that the complaint alleges a valid claim under the Unfair Trade Practices and Consumer Protection Law (UTPCPL) LSA–R.S. 51:1401 *et seq.* (West 1987 & Supp.1991).

Second, I dissent to the Court's refusal to certify to the Supreme Court of Louisiana the question of whether, for the conduct of the defendants, there is liability under Louisiana's limited adoption of the

doctrine of tortious interference with contract.

### I.

*UTPCPL Claim was Stated*

I start with the unchallengeable federal standard under F.R.Civ.P. 12(b)(6), for dismissal for failure to state a claim. *Conley v. Gibson*,[1] 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), states it succinctly:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102, 2 L.Ed.2d at 84.

The Court's opinion and the complaint (pars. 14, 15) asserts these facts: There was litigation involving the Jefferson Davis Parish Sanitary Landfill Commission (the Commission), the town of Welch and the Jefferson Davis Police Jury seeking to enjoin the enforcement of the initial and interim agreement between American Waste and the Commission. The complaint charged, with specificity reminiscent of old-fashioned pre-F.R.Civ.P. pleadings, several things. See pars. 25, 26, 27, 28, 29 and 30. Of importance is the fact that, after an adverse decision in the litigation by a Louisiana State Court, American Waste and the Commission worked out an agreement, informally approved by all the parties, to settle the controversy. Being governmental entities, formal approval was contemplated. The settlement would have removed the last obstacle to performance of the initial and interim contract between American Waste and the Commission.

Notwithstanding actual knowledge by Browning–Ferris, Inc. (BFI) that the Commission and American Waste were negotiating amendments to the contract and that the parties had informally consented to a

---

company. *Id.* at 121, 123. It does not alter our analysis. Unlike this case, the allegations do not appear to be grounded entirely in tortious interference with contract. In fact, it appears that the early tortious interference claim in *Jarrell* has been dropped and that it is also proceed-

ing, *inter alia*, on a claim of misrepresentation. *See id.* at 122 & n. 1 and 124.

**1.** We have had hundreds of cases applying this principle. *Barber v. Motor Vessel "Blue Cat"*, 372 F.2d 626 (5th Cir.1967); *Cook & Nichol, Inc. v. Plimsoll Club*, 451 F.2d 505 (5th Cir.1971).

settlement of all litigation, BFI intentionally bound itself to pay in excess of $5 million to induce the Commission to withdraw from their contractual relationship and the settlement negotiations and to repudiate the contractual agreements with American Waste.

Unadorned by legalistic pleading jargon, this was American Waste's *Conley v. Gibson* charge:

> By the promise to pay $5 million, BFI induced the Commission to (i) withdraw from negotiations of the settlement, and, (ii) repudiate the Commission–American Waste contracts, initial and interim, so that BFI would get the contract.

Without even intimating, much less implying, at this stage, that the payment of $5 million was unlawful, a bribe, etc., it remains that, by payment of money, BFI was able to obstruct the settlement and performance of the contracts, initial and interim, between American Waste and the Commission, all of this to BFI's monetary gain.

In the face of these factual allegations (assuming they are ultimately supported by evidentiary proof) Louisiana has judicially established that a jury could find such conduct to violate UTPCPL. *Jarrell v. Carter*, 577 So.2d 120 (La.App.), *writ denied*, 582 So.2d 1311 (La.1991).

The UTPCPL is both exceedingly broad and lacking in detail. It declares:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful.

*Id.* at 123.

*Jarrell* emphasizes:

> What constitutes an unfair trade practice is better determined by the courts on a case-by-case basis…. In that way, the many harms sought to be proscribed by the [UTPCPL] can be prevented.

*Id.*

What is an unfair practice is likewise broadly stated:

> It has been held that a practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious. *Roustabouts*, 447 So.2d at 548.

*Id.*

Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members.

Like *Jarrell*, the conduct here "does allege facts sufficient to classify [American Waste] as a member of the group provided for by the [UTPCPL]". *See id.* at 123–24.

The way in which the UTPCPL is stated and applied means that each particular set of alleged facts must be analyzed by the trial court in terms of whether such conduct is a practice which is unfair, because it offends established policy, and is unethical, oppressive, unscrupulous or substantially injurious. This is without regard to Louisiana's modification of the doctrine of tortious interference with contract.[2]

I cannot believe that the Louisiana business community or the distinguished judiciary of Louisiana would tolerate a conclusion that by payment of money obstructing a contractual relationship or repudiating a contract would not qualify as conduct that was both unethical and unfair. The claim of Waste Management comes down to the graphic charge that a non-contracting party, by use of large sums of money, can legitimately seek to destroy the contractual relationship and, worse, induce a contracting party to repudiate the contract. Additionally, since such conduct destroyed a profitable contract, this "confers a right of private action on '[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal from unfair trade practices.'" *Id.* at 123.

Here we do not have to predict what Louisiana courts would do. They have eloquently spoken.

Our *Erie* duty compels us to recognize that Waste Management is entitled as of right to a trial to determine whether it

---

**2.** *See* Part II.

factually establishes a UTPCPL basis for recovery.

## II.

### Tortious Interference With Contract Should Be Certified to the Louisiana Supreme Court

Sketching briefly Waste Management's detailed allegation, so fully and fairly recited in the court's opinion, this is the graphic charge:

> Waste Management had both the initial long-term contract and the interim contract with the Commission to permit Waste Management to operate and manage the landfill pending implementation of the initial contract. Notwithstanding full knowledge by BFI that Waste Management and the Commission were engaged in negotiating proposed amendments, BFI destroyed the contractual relationship. BFI did this by offering $5 million to the Commission to induce the Commission to break off these contractual relationships and repudiate the contracts initial and interim.

The Supreme Court of Louisiana in *9 to 5 Fashions, Inc. v. Spurney,* 538 So.2d 228 (La.1989), expressly overruled the ancient case of *Kline.*[3] Our panel opinion recognizes the judicial embarrassment to the State of Louisiana due to the negative rule of *Kline,* which was out of step with modern jurisprudence.

Such embarrassment was pointed out by the Supreme Court of Louisiana in vivid terms:

> [T]he common law authorities relied upon in *Kline v. Eubanks* have been outflanked and rendered obsolete by modern economic developments. The position taken in those cases and commentaries has been abandoned by all Anglo–American jurisdictions and is contrary to the

weight of opinion in other civil law jurisdictions. Louisiana is now the only American state that does not recognize the action for tortious interference with contractual relations.

*9 to 5,* 538 So.2d at 232.

The Louisiana Supreme Court went on to describe the *Kline* bar against suits for intentional interference with contracts as "anachronistically unjust," significantly citing *Sanborn v. Oceanic Contractors, Inc.,* 448 So.2d 91 (La.1984),[4] where it had previously suggested that intentional tortious interference with contract rights might, after all, be actionable. *9 to 5,* 538 So.2d at 234.

Thus, while the Louisiana Supreme Court in *9 to 5* did indeed decline to adopt the entire law of tortious interference with contract in one bold brush stroke, it did not express the intention that joining the other 49 states in recognizing the modern concepts of that doctrine would be confined to the limited circumstances of *9 to 5,* the first case addressing the issue. Instead, noting criticisms that the tort tended to be "undefined" with "no specific conduct ... proscribed," *9 to 5,* 538 So.2d at 234 (quoting W. Prosser & P. Keeton, The Law of Torts § 129, p. 979 (5th ed. 1984)), the court expressed an intent to proceed judiciously, rather than "adopt ... the fully expanded common law doctrine," *Id.,* 538 So.2d at 234, and to consider on a case-by-case basis what behavior should be proscribed.

Without disparaging the classic case of well-defined outright interference with a contract by the payment of money, the most the court did was to state:

> *[i]n the present case* we recognize ... only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation be-

---

3. *Kline v. Eubanks,* 109 La. 241, 33 So. 211 (1902).

4. In *Sanborn,* the court stated that:

   there have been recent expressions by some members of this Court that, in a case squarely presenting the issue, *Forcum–James [Co. v. Duke Transportation Co.,* 231 La. 953, 93 So.2d 228 (1957) (following *Kline* in refusing

   to recognize a cause of action for tortious interference with contract)] should be re-examined.... [W]ere plaintiff to allege and prove defendant intentionally and willfully interfered with plaintiff's contract ..., he might be entitled to relief.

   448 So.2d at 95, n. 5.

tween his employer and a third person." *Id.* (emphasis added).

The *9 to 5* court's statements are not those of a court that intends to give an inch but not a millimeter more.

Instead, although apparently embarrassed at the anachronistic state of its law, the court expressed merely the intention in *9 to 5* as well as in *Sanborn,* to take the creation of Louisiana's version of the law of tortious interference one step at a time, with issues squarely before the court. BFI's actions constitute a classic case of common law intentional interference with a contract by payment of money. This would provide the perfect opportunity for the Louisiana Supreme Court to further develop its fledgling doctrine. But instead of certifying to authoritatively determine where the Louisiana Supreme Court would take the doctrine, our panel decision freezes Louisiana's law, until another day, where it already has been.[5]

That the state's intermediate appellate courts have grudgingly rejected expansion of the tort recognized in *9 to 5* is not surprising. As was stated by the concurring opinion in *Tallo v. Stroh Brewery Co.,* 544 So.2d 452, 455 (La.App. 4th Cir.), writ denied, 547 So.2d 355 (La.1989), that is "the Supreme Court's function." Nor is it surprising that, after 92 years of refusing to recognize the tort, the Louisiana Supreme Court has not had an opportunity in the two and one-half years since *9 to 5* to expand upon the decision.

The decision in *Great Southwest Fire Ins. Co. v. CNA Inc. Cos.,* 557 So.2d 966 (La.1990), far from limiting the new tort to *9 to 5's* facts, simply reiterates the Court's intention to *"proceed with caution in expanding that cause of action," Id.* at 969 (emphasis added), but indeed to proceed. *Great Southwest Fire* did not present an opportunity to expand or to limit *9 to 5* at all, because it involved *negligence,* not intentional interference with a contract. It dealt with the specific duty of a prime insurer to an excess underwriter.

*When in Real Doubt, Certify*

Floundering around, at best, in an effort to predict what the Supreme Court of Louisiana would do, we deny, not only to the parties but to the jurisprudence of Louisiana as well, the opportunity to obtain an authoritative answer to the problem facing this panel.

*Certifiable*

The U.S. Supreme Court has enthusiastically endorsed the extensive use by the Fifth Circuit of certification and has itself made use of the certification procedure. In *Salve Regina College v. Russell,* 499 U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) the Court said, "Of course, a question of state law usually can be resolved definitively if the litigation is instituted in state court and is not finally removed to federal court, or if a certification procedure is available and is successfully utilized." *Id.* at ——, n. 4, 111 S.Ct. at 1224, n. 4, 113 L.Ed.2d at 202, n. 4.

The Court most recently ordered certification in *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782, declining to address the constitutionality of a challenged Virginia statute without an interpretation by the Virginia Supreme Court, *certified question answered, Commonwealth v. American Booksellers Ass'n, Inc.,* 236 Va. 168, 372 S.E.2d 618 (1988).

The Supreme Court made favorable note of "[t]he Fifth Circuit's willingness to certify" because of "frequent state court repudiation of its interpretations of state law," in *Lehman Bros. v. Schein,* 416 U.S. 386, 390, n. 6, 94 S.Ct. 1741, 1743, n. 6, 40 L.Ed.2d 215, 219, n. 6 (1974); *see also W.S. Ranch Co. v. Kaiser Steel Corp.,* 388 F.2d 257, 266 (10th Cir.1967) (Brown, J., dissenting from failure of court to remit to New Mexico courts for declaratory judgment proceedings and citing numerous federal decisions overruled in state courts), *rev'd,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968), *on remand,* 81 N.M. 414, 467 P.2d 986 (1970) (New Mexico Supreme Court rejecting 10th Circuit decision); *Chotin*

---

**5.** *See,* e.g. *Peacock v. Brightway Signs, Inc.,* 545    So.2d 649 (La.App. 5th Cir.1989).

*Transportation, Inc. v. M/V HUGH C. BLASKE,* 475 F.2d 1370, 1371 (5th Cir. 1973) (Brown, J., dissenting and citing numerous federal decisions overruled in state courts). In *Lehman Bros.,* the Supreme Court held that while resort to available certification procedures is discretionary, it was especially appropriate because of the unsettled state of the relevant Florida law involved. Thus the case was vacated and remanded to the Court of Appeals for the Second Circuit to "reconsider" whether to certify, as had been urged by the dissent in the Court of Appeals. *Id.* 416 U.S. at 391–92, 94 S.Ct. at 1744, 40 L.Ed.2d at 220. The Court said that "[certification] does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism." *Id.* at 391, 94 S.Ct. at 1744, 40 L.Ed.2d at 220.

Urging use of innovative means to secure an authoritative answer, the Court commented favorably upon the use of a stay pending a state declaratory judgment action where no certification procedure is available, citing *Kaiser Steel* and *Meredith v. City of Winter Haven,* 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943). *Lehman,* 416 U.S. at 390, 94 S.Ct. at 1744, 40 L.Ed.2d at 220.

The use of certification [6] has its impetus in *Clay v. Sun Ins. Office, Ltd.,* 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960), *on remand,* 319 F.2d 505 (5th Cir.1963), where the Court urged the Fifth Circuit on remand to certify the question to the Florida Supreme Court.

The Supreme Court has also certified questions in, *Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982) (what premises support Georgia Supreme Court conclusion that death sentence is not impaired by invalidity of one of several statutory aggravating circumstances found by a jury), *answer conformed to,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); and *Aldrich v. Aldrich,* 375 U.S. 249, 84 S.Ct. 305, 11 L.Ed.2d 304 (1963), *rev'd,* 378 U.S. 540, 84 S.Ct. 1687, 12 L.Ed.2d 1020 (1964).

The Fifth Circuit most recently used the device to certify questions of Mississippi law determinative of the cause of action in *Puckett v. Rufenacht, Bromagen & Hertz, Inc.,* 903 F.2d 1014, *opinion amended by,* 919 F.2d 992 (5th Cir.1990), *certified question answered,* 587 So.2d 273 (Miss.1991).

It is judicially wise and administratively economical to certify the question to the Louisiana Supreme Court since it has not defined or even dealt with the scope of the duty of *competitors* to refrain from tortious interference with contractual relationships and repudiation of contracts and whether such conduct constitutes a statutory unfair trade practice.

Acknowledging as we did in *Puckett* that "[w]e may, in our *Erie* role, decide these unsettled questions of state law in the way in which it appears to us that the Supreme Court of [the state] would do," we chose, "rather than risk pronouncing a result which that court later would not follow," 903 F.2d at 1021, to certify.[7]

Recognizing that the procedure affords to the Louisiana Courts the preservation of its sovereign right to determine major policy decision, the Louisiana Supreme Court since adopting its certification procedure in 1972, has frequently responded to certified questions from this court.

Examples include *Deshotels v. SHRM Catering Services, Inc.,* 842 F.2d 116, *supplemented,* 845 F.2d 582 (5th Cir.1988), *answer conformed to, Sifers v. General Ma-*

---

6. If certified, counsel will be engaged in drafting proposed questions.

7. Some other cases in which this Court has made good use of certification include: *Manookian v. A.H. Robbins Co., Inc.,* 760 F.2d 567 (5th Cir.1985); *Boardman v. United Services Auto. Ass'n,* 742 F.2d 847 (5th Cir.1984), *answer conformed to,* 768 F.2d 718 (5th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Sandefur v. Cherry,* 718 F.2d 682, *as amended,* 721 F.2d 511 (5th Cir.1983), *answer conformed to,* 744 F.2d 1157 (5th Cir.1984); *Anderson v. Jackson Municipal Airport Authority,* 645 F.2d 401 (5th Cir.1981), *answer conformed to,* 691 F.2d 742 (5th Cir.1982); *Trail Builders Supply Co. v. Reagan,* 409 F.2d 1059 (5th Cir.1969), *answer conformed to,* 430 F.2d 828 (5th Cir.1970); *Martinez v. Rodriguez,* 394 F.2d 156 (5th Cir.1968), *answer conformed to,* 410 F.2d 729 (5th Cir.1969).

*rine Catering Co.*, 892 F.2d 386, *modified in part on reh'g*, 897 F.2d 1288 (5th Cir. 1990); and *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367 (5th Cir.1986) (scope of Louisiana long-arm statute), *reh'g. denied*, 808 F.2d 1520, *answer conformed to*, 834 F.2d 510 (5th Cir.1987).

Because of the importance of these questions and the unsettled state of Louisiana law, I would certify the questions to the Louisiana Supreme Court. I therefore dissent to this court's failure to certify.