IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-30425
_____

PENNY HOLDEN, Etc.; ET AL.,

                                                    Plaintiffs,

                          versus

CONNEX-METALNA MANAGEMENT CONSULTING GMBH, Etc.; ET AL.,

                                                    Defendants.
_____

RELIANCE NATIONAL INSURANCE COMPANY,

                          Plaintiff - Appellee - Cross-Appellant,

                          versus

LEXINGTON INSURANCE COMPANY; WESTCHESTER SURPLUS LINES
INSURANCE COMPANY,

                          Intervenors - Appellants - Cross-Appellees,

WESTCHESTER FIRE INSURANCE COMPANY; GENERAL STAR
INDEMNITY COMPANY,

                          Intervenors - Cross-Appellees,

                          versus

I C RAILMARINE TERMINAL COMPANY, INC.,

                                                    Defendant.
_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

August 28, 2002

Before JOLLY, DeMOSS, and PARKER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Insurers are disputing the allocation of liability for losses suffered by their insured, IC RailMarine Terminal Co. ("IC RailMarine"). The losses were caused by the collapse of a crane that had just been installed as part of the construction of IC RailMarine's cargo terminal on the Mississippi River. The damage was covered by various layers of property insurance. The policies included a builder's risk policy issued by Reliance National Insurance Co. ("Reliance"), a joint blanket property policy issued by Lexington Insurance Co. ("Lexington") and Westchester Surplus Lines Insurance Co. ("Westchester Surplus"), and a joint excess property policy issued by Westchester Fire Insurance Company ("Westchester Fire") and General Star Indemnity Company ("General Star").

The central question is whether the blanket policies, which provide nationwide coverage for all property owned by IC RailMarine's parent corporation, provide primary coverage for the crane collapse or whether the builder's risk policy, which was purchased specifically for the construction project, must be exhausted before coverage under the blanket policies is triggered. To answer this question, we are required to make an Erie guess. We determine that, under the particular circumstances of this case, the Louisiana Supreme Court would conclude that the blanket property policy functions as an "excess" policy with respect to a

2

loss associated with the construction project where the builder's risk policy purchased specifically for that project provided primary coverage for the loss. Thus, Reliance is the sole primary insurer of the loss at issue here. Accordingly, we reverse the district court's apportionment of liability to the general insurers, Lexington and Westchester Surplus, and remand the case to the district court for further proceedings not inconsistent with this opinion.

I

The relevant facts are not in dispute. In early 1998, IC RailMarine was constructing a bulk cargo terminal in Convent, Louisiana. As part of this project, IC RailMarine hired Connex-Metalna to design, build, and install a 240-foot gantry crane that could load and unload cargo from ships docked at the terminal. Connex-Metalna constructed and installed the crane at the IC RailMarine terminal, but the crane fell into the Mississippi River during a pre-acceptance load test performed on June 11, 1998. Following the accident, IC RailMarine filed insurance claims for the resulting losses under (1) the builder's risk insurance policy issued by Reliance, (2) the joint general property policy issued by Lexington and Westchester Surplus, and (3) the joint excess property policy issued by Westchester Fire and General Star.

Although all of these policies covered the property damage caused by the collapse of the crane, each policy covered a

3

different range of exposures. The builder's risk policy issued by Reliance covered only property connected with the construction of IC RailMarine's bulk terminal in Convent, up to a limit of $19.42 million.[1] In contrast, the blanket property policy issued by Lexington and Westchester Surplus -- which was not connected with the construction project -- covered all real and personal property throughout the country held by the Illinois Central Corp. and its subsidiaries, including IC RailMarine. The policy provided up to $8 million in coverage for losses in excess of a $2 million self-insured retention.[2] To cover losses to its property above $10 million, Illinois Central purchased the joint excess property policy from Westchester Fire and General Star with a coverage limit of $15 million.

In October 1998, Reliance filed this action in the Eastern District of Louisiana seeking a declaration of its rights and obligations under the builder's risk policy. A year later, Lexington, Westchester Surplus, Westchester Fire, and General Star intervened in the declaratory judgment action. The parties filed

---

[1] Reliance issued the builder's risk policy to Illinois Central Railroad Co. Illinois Central Corp. is the ultimate parent corporation of both IC RailMarine and Illinois Central Railroad.

[2] Illinois Central Railroad also purchased a commercial property insurance policy from Royal Surplus Lines Insurance Co. ("Royal") to cover IC RailMarine's $2 million deductible under the general property policies.

cross motions for summary judgment in September 2000.[3]  In its summary judgment motion, Reliance argued that the losses caused by the crane accident were not covered by the builder's risk policy. Lexington and Westchester Surplus argued that, as blanket insurers, they were not obligated to pay for losses associated with the crane accident until the builder's risk policy -- which, as we have noted, was issued by Reliance specifically for the construction project -- reached its coverage limit.

The district court held that, although the exclusions in the builder's risk policy did not bar coverage in this case, factual issues remained concerning whether Reliance could deny coverage under other terms of the policy.  The district court further rejected the argument advanced by Lexington and Westchester Surplus that Louisiana law treats blanket policies as excess insurance where the specific policy provides primary coverage.

Shortly before the trial on the remaining factual questions, IC RailMarine settled all of its claims against Reliance, Lexington, and Westchester Surplus for $11.5 million.[4]  According to the terms of the settlement, the three insurers reserved the

---

[3]  In addition, IC RailMarine asserted claims against the intervening general property insurers. The declaratory judgment action was ultimately consolidated with an action filed by individuals who were injured in the crane accident.

[4]  In a separate agreement, IC RailMarine settled its claim under Royal's policy covering the general property policy deductible for $1.975 million.  IC RailMarine thus settled all of its insurance claims associated with the crane accident for a total of $13.475 million.

5

right to litigate each company's share, if any, of the $11.5 million settlement amount. Before proceeding to trial, Reliance moved to exclude extrinsic evidence of the parties' interpretation of the blanket policies.[5]

The district court held that the proffered parol evidence was not admissible under Louisiana law because the language in the relevant insurance policies was unambiguous. Specifically, the district court found that (1) the plain language of the joint policy issued by Lexington and Westchester Surplus provided primary coverage for the losses associated with the crane accident and (2) the joint policy issued by Westchester Fire and General Star was a "true" excess policy under the plain meaning of its terms and therefore did not provide coverage until coverage under the primary policy was exhausted. The district court then determined that the $11.5 million settlement with IC RailMarine should be divided among the three primary insurers in the proportion that their respective policy limits bear to the combined policy limit. The district court therefore allotted $8.165 million to Reliance, $2.084 million to Lexington, and $1.251 million to Westchester Surplus. This appeal followed.

---

[5] Following Reliance's motion to exclude, the general property insurers proffered testimony by employees of IC RailMarine and the blanket insurers concerning their understanding of (1) the priority of payment between general and specific insurance policies and (2) the interpretation of specific provisions in the blanket insurance policies. In response, Reliance filed a counter-proffer tending to refute the testimony proffered by the general property insurers.

6

Before turning to the substantive question posed in this case, we must deal with Reliance's motion to stay these proceedings in deference to a Pennsylvania state court order.

On May 29, 2001, the Commonwealth Court of Pennsylvania issued an order placing Reliance in rehabilitation.[6] Under the rehabilitation order, the Pennsylvania Insurance Commissioner has sole authority to dispose of assets held by Reliance and to satisfy claims against Reliance. The order also includes a provision that purports to stay "[a]ll actions currently pending against Reliance in the Courts of the Commonwealth of Pennsylvania or elsewhere." Reliance argues that we are required to abstain from exercising jurisdiction in this case under Burford v. Sun Oil Co., 319 U.S. 315 (1943), because our decision is likely to interfere with the orderly administration of Reliance's assets by state authorities.

The Burford abstention doctrine stands as a narrow exception to the rule that federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996). As we observed in Webb v. B.C. Rogers Poultry, Inc., 174 F.3d 697, 700-01 (5th Cir. 1999), the Burford doctrine requires us to "weigh the federal interests in retaining jurisdiction over the dispute against the

---

[6] The state court issued the order after the parties had filed their notices of appeal from the district court judgment but before oral argument was held in this Court.

state's interests in independent action to uniformly address a matter of state concern, and to abstain when the balance tips in favor of the latter."

Unlike an outright dismissal of a federal action, a stay of federal proceedings on abstention grounds is best viewed as a "postponement of decision for its best fruition."[7]  Quackenbush, 517 U.S. at 720-21.  Thus, a stay is typically warranted to await resolution of a difficult, potentially controlling issue of state law.  See id.; see also Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 27 (1959) ("We have increasingly recognized the wisdom of staying actions in the federal courts pending determination by a state court of decisive issues of state law.").

In the appeal before us, however, there is no decisive issue of Pennsylvania law to be decided.  Neither does the issue of law that we address implicate federalism concerns -- unlike, for example, the exercise of the state's power of eminent domain, the relationship between city and state, or the application of a new state statute of questionable constitutionality.  See Thibodaux, 360 U.S. at 27-28.  Although the Pennsylvania state court order may very well preclude enforcement of any judgment against Reliance, we fail to see how our resolution of this appeal would substantially

---

[7]  The Supreme Court has identified a distinction "between abstention-based remand orders or dismissals and abstention-based decisions merely to stay adjudication of a federal suit." Quackenbush, 517 U.S. at 720.  In this case, Reliance has requested only an "order staying all further proceedings in this action."

8

interfere in the administration of Reliance's assets by the Pennsylvania state authorities. In short, we conclude that a stay of these proceedings is neither required nor appropriate.

III

The pivotal issue in this appeal is whether the joint blanket policy issued by Lexington and Westchester Surplus provides primary coverage of the losses associated with the collapse of the crane. Reliance argues that all of the general property insurers (along with Reliance itself) are obligated to provide primary coverage for the losses incurred by IC RailMarine because they all agreed to insure the same property and the same risk. Thus, Reliance argues that the losses must be allocated among all of the companies that insured the damaged property.

Lexington and Westchester Surplus respond that their blanket property policy does not cover the same exposure as the builder's risk policy issued by Reliance. Relying principally on Fasullo v. Am. Druggists' Ins. Co., 262 So.2d 810 (La. App. 4 Cir.), writ denied, 266 So.2d 220 (La. 1972), they argue that Louisiana law establishes different levels of priority for insurance coverage depending on whether the coverage is "general" or "specific." According to Lexington and Westchester Surplus, under Louisiana law, insurance coverage that applies only to specified property -- like the builder's risk policy issued by Reliance in this case -- must be exhausted before coverage is triggered under blanket

9

property policies. The rationale for this rule is simple: The law should presume that a blanket property policy is intended only to cover losses in excess of the limits of a policy purchased for a specific project because it is redundant to purchase a project-specific policy that simply duplicates the coverage of the broader blanket policy. Following this principle, Lexington and Westchester Surplus argue that Reliance is the sole primary insurer of losses connected with the terminal construction project, while the general property policies provide successive layers of excess insurance in the event that the builder's risk policy is not sufficient to cover the losses.

The district court, however, agreed with Reliance and concluded that <u>Fasullo</u> does not control in this case. Instead, the district court held that the Lexington and Westchester Surplus policy provided primary coverage for the losses at issue here. We review the district court's interpretation of insurance policies de novo. <u>See</u> <u>Norfolk Shipbuilding & Drydock Corp. v. Seabulk Transmarine Partnership, Ltd.</u>, 274 F.3d 249, 252 (5th Cir. 2001).

In this diversity case, the parties agree that the substantive law of Louisiana governs our decision.[8] The Louisiana Supreme Court, however, has not addressed whether blanket insurance

---

[8] Because the insurance policies at issue here do not contain choice-of-law provisions, the district court applied the law of the forum state, Louisiana. <u>See</u> <u>Guaranty Nat. Ins. Co. v. Azrock Industries Inc.</u>, 211 F.3d 239, 243 (5th Cir. 2000). The parties do not challenge this decision on appeal.

10

policies become "excess" policies where a more specific policy applies. We must therefore determine, in our best judgment, how the Louisiana Supreme Court would resolve the issue if presented with the same case. See Rogers v. Corrosion Prod., Inc., 42 F.3d 292, 295 (5th Cir. 1995); Associated Int'l Ins. Co. v. Blythe, 286 F.3d 780, 783 (5th Cir. 2002). Although an intermediate appellate court decision is "not controlling where the highest state court has not spoken on the subject," we ordinarily defer to the holdings of lower appellate courts in the absence of guidance from the highest court. Rogers, 42 F.3d at 295; Blythe, 286 F.3d at 783. As always, in conducting this inquiry our task is "to predict state law, not to create or modify it" -- that is, we are "to apply existing [Louisiana] law, not to adopt innovative theories for the state." United Parcel Service, Inc. v. Weben Industries, Inc., 794 F.2d 1005, 1008 (5th Cir. 1986).

As Lexington and Westchester Surplus point out, Fasullo is the only Louisiana case to address the prioritization of payments between general and specific insurers.[9] The dispute in Fasullo

[9] The district court declined to apply Fasullo because other Louisiana courts have not followed it. It would appear, however, that no other Louisiana court has had occasion to address this issue. The district court also observed that the Louisiana First Circuit Court of Appeal in Prudential Assur. Co. Ltd. v. London & Hull Maritime Ins. Co., Ltd., 621 So.2d 1165, 1167 (La. App. 1 Cir. 1993), asserted that Fasullo is "no longer 'good law.'" Taken in context, however, this statement refers only to Fasullo's separate holding that the Louisiana proration statute does not create an affirmative right to contribution. See also Rocha v. Landry, 615 So.2d 995, 998 & n.5 (La. App. 1 Cir. 1993) (observing that several courts have declined to follow Fasullo's holding that the pro rata

11

arose out of a fire that destroyed a building housing two separate businesses -- a retail drugstore and a wholesale drug business -- owned by the same insured. 262 So.2d at 811. The dispute centered on the allocation of the resulting losses among three insurers. See id. One insurer's policy covered only the property associated with the retail drugstore, while the other two insurers issued blanket policies covering the entire building, including all personal property owned by the insured. See id. In resolving this dispute, the Louisiana Fourth Circuit Court of Appeal held that a "specific policy must bear the entire loss on the portion of the [property] which it covers up to its face amount, with the blanket policy or policies affording residual or excess coverage to the extent of their respective limits of liability."[10]  Id. at 815

statute does not create a right to contribution). Finally, the district court suggested that Fasullo is distinguishable from the instant case because Fasullo involved the interpretation of the Louisiana proration statute rather than a contractual proration clause. The court's holding in Fasullo, however, was based on policy considerations and not on the court's interpretation of statutory language. In any event, the proration statute does not come into play until the court identifies multiple insurers that provide primary coverage for the loss. In sum, we find that Fasullo remains persuasive authority on this issue.

[10] As Reliance observes, the builder's risk and the blanket property policy both contain "other insurance" provisions that purport to convert each policy into an excess policy where another insurer provides concurrent coverage. Where effective, such provisions ordinarily cancel each other out, and the loss is prorated among the insurers. See Hartford Fire Ins. Co. v. Roger Wilson, Inc., 291 So.2d 852, 856 (La. App. 3 Cir. 1974); Jefferson Downs, Inc. v. American General Ins. Co., 214 So.2d 244, 248 (La. App. 4 Cir. 1968). But, under the "Pennsylvania Rule," a specific policy and a blanket policy do not constitute concurrent or double insurance because they do not cover the same range of property.

12

(citing <u>Sloat v. Royal Ins. Co.</u>, 49 Pa. 14 (1865); <u>Blue Anchor Overall Co. v. Penn. Lumbermens Mut. Ins. Co.</u>, 123 A.2d 413 (Pa. 1956)).  The court reasoned that this rule, often known as the "Pennsylvania Rule," maximizes the scope of insurance coverage by avoiding overlapping coverage by multiple insurers.  <u>See</u> <u>id.</u>

We find the principle applied in <u>Fasullo</u> instructive in making our <u>Erie</u> guess of how the Louisiana courts would resolve the coverage issue in the instant case.  More specifically, we believe that the Louisiana Supreme Court would hold that, when a policy is purchased to cover a specific loss at a specific property during the course of a specific project, its coverage must be first exhausted before coverage arises under a general blanket policy that covers all property losses at all of the insured's various properties.

We recognize that the "Pennsylvania Rule" applied in <u>Fasullo</u> represents a minority position among the courts that have considered the priority of coverage between general and specific policies.[11]  We are nevertheless persuaded that the Louisiana

---

See <u>Fasullo</u>, 262 So.2d at 812.  Under this view, the "other insurance" provisions in the builder's risk and blanket property policy are not triggered.  Because <u>Wilson</u> and <u>Jefferson Downs</u> did not involve policies with differing scopes of coverage, they are distinguishable from the present case.

[11] Under the majority view, policies that cover the same risks with respect to the damaged property must be treated as "concurrent insurance" -- even if the policies do not cover an identical set of property.  <u>See</u>, e.g., <u>Am. Emp. Ins. Co. v. Continental Cas. Co.</u>, 512 P.2d 674, 678 (N.M. 1973) (adopting the "prevailing view" that  general policies prorate with specific policies); <u>Home v. Great American Ins. Co.</u>, 134 S.E.2d 865 (Ga. App. 1964) (same); <u>Indus. Indemnity Co. v.</u>

Supreme Court, if presented with the particular facts in this case, would follow the principle applied in Fasullo.[12] We do not, however, extend our Erie guess to predict how the Louisiana Supreme Court might resolve coverage issues between general and specific policies in other contexts. We only conclude that, where an insured has in force blanket property policies that cover the same property as a policy purchased specifically for a well-defined project, the Louisiana Supreme Court would hold that the blanket policies provide coverage only for losses in excess of the limits

Continental Casualty Co., 375 F.2d 183 (10th Cir. 1967) (same under Oklahoma law); South Carolina Ins. Co. v. Fidelity and Guar. Ins. Underwriters, Inc., 489 S.E.2d 200, 214 (S.C. 1997) (rejecting distinction between specific and general policies and instead determining which policies were intended to provide primary coverage); see generally 15 Couch on Insurance § 219:17 at 24-25 (3d ed. 1999) ("As a rule, general policies prorate with specific policies. . . ."); 44 Am. Jur. 2d Insurance § 1786 (collecting cases and stating that the "majority of courts" agree that "[b]lanket policies prorate with specific policies").

[12] Other courts have similarly found the occasion to apply the "Pennsylvania Rule." See United Services Auto. Ass'n v. U. S. Fidelity & Guaranty Co., 555 S.W.2d 38, 43 (Mo. App. 1977) ("Since the U.S.A.A. policy affords blanket or floater coverage and the U.S.F. & G. is a specific coverage policy under the principles above discussed, the latter affords primary coverage and the former is only supplemental or excess coverage and responsibility attaches under it only when the specific coverage has been exhausted."); Mill Factors Corp. v. Ming Toy Dyeing Co., 41 F.Supp. 467, 469 (D.C.N.Y. 1941) (holding that specific policy covering goods at a specific location must bear loss before coverage under floater policy is triggered although both policies contained "other insurance" clauses); see also John A. Appleman & Jean Appleman, Insurance Law & Practice § 3912 (1972) ("A blanket or floating policy is only intended to supplement specific insurance, and it cannot become operative until the specific insurance has become exhausted."); Continental Cas. Co. v. Suttenfield, 236 F.2d 433, 438 (5th Cir. 1956) ("We are reminded of the holding of some courts that where two or more policies of insurance are partly coextensive as to assumed hazards, the primary liability should be cast upon the company whose policy affords specific insurance.").

14

of the project-specific policy.[13]

Applying this rule to the facts of the present case, we hold that the builder's risk policy issued by Reliance provides primary coverage for the losses caused by the crane accident, while the blanket property policy issued by Lexington and Westchester Surplus provides coverage for losses in excess of the builder's risk policy limit.  As a consequence, the district court erred in holding that Lexington and Westchester Surplus were primary insurers of the IC RailMarine construction project and shared in the liability for the damages associated with that project.

IV

For the reasons set out above, we reverse the district court's judgment apportioning the losses from the crane accident among Reliance, Lexington, and Westchester Surplus and remand to the district court for further proceedings not inconsistent with this opinion.  We affirm the district court's judgment insofar as it holds that Westchester Fire and General Star are not primarily liable for the losses caused by the crane collapse.[14]

---

[13] Of course, the presumption would be rebutted if the insured negotiated a lower premium from one or both of the insurers based on the concurrent coverage.  In this case, however, there is no evidence that the insured negotiated a lower price for the builder's risk policy or the blanket insurance policies.  Indeed, Reliance's position appears to be that the insured was essentially unaware of the overlapping coverage when it purchased the Reliance policy.

[14] Reliance maintains that the policies issued by Westchester Fire and General Star are not "excess" policies because they cover precisely the same exposures as the other general property

15

REVERSED IN PART, AFFIRMED IN PART, and REMANDED.

---

policies.  We need not reach this question, however, because we conclude that none of the general property insurers are primarily liable for the losses at issue here.