NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-1605                                    Appeals Court

  H.P. HOOD LLC  vs.  ALLIANZ GLOBAL RISKS US INSURANCE COMPANY.


                     No. 14-P-1605.

     Suffolk.     September 2, 2015. - November 2, 2015.

          Present:  Meade, Wolohojian, & Milkey, JJ.


Contract, Insurance.  Insurance, "All risk" policy, Construction
     of policy, Coverage, Property damage.  Practice, Civil,
     Summary judgment.



     Civil action commenced in the Superior Court Department on
November 5, 2010.

     The case was heard by Christine M. Roach, J., on motions
for summary judgment.


     Steven L. Schreckinger for the plaintiff.
     Kristin A. Heres for the defendant.


     MILKEY, J.  Plaintiff H.P. Hood LLC (Hood) suffered various

losses when a bottled beverage it was producing for another

company failed certain quality control measures.  At issue is

whether those losses are covered by the "all risks" property

insurance policy that Hood had purchased from the defendant,

Allianz Global Risks US Insurance Company (Allianz).  On cross motions for summary judgment, a Superior Court judge ruled in Allianz's favor, concluding that Hood's losses fell within certain exclusions to the policy.  Because we agree that any potentially covered losses are excluded, we affirm.

Background.  The product.  The essential facts are not in dispute.  The product at issue is a milk-based specialty drink marketed by Abbott Laboratories (Abbott) under the trade name Myoplex.  Myoplex is a "shelf stable" beverage, meaning that it is designed to require refrigeration only after its bottles are opened.  In order to ensure that the product does not spoil before that, it must be manufactured and bottled under strict aseptic conditions, and its bottles must stay hermetically sealed until consumers open them.

The contract between Hood and Abbott.  In November of 2008, Abbott and Hood entered into a contract under which Hood would produce at least forty million bottles of Myoplex in the first year.  The contract, which was termed a "contract packaging agreement," required Hood to conduct quality control testing.  Attachments to the contract, and subsequent written and oral agreements, added specificity to the particular tests and protocols that Hood agreed to use.  Some of the required testing was designed to ensure that the Myoplex was contaminant-free during the production and bottling process (that is, up until

the point the bottles were ready for distribution). None of that testing revealed any contamination or other problems in any of the relevant bottles.

Other testing was designed to ensure that the Myoplex bottles would stay hermetically sealed after they left the bottling plant and faced the rigors of transport to eventual end users. One such test, known as the secure seal test, examined whether bottles submerged in water retained their seals even after the pressure inside the bottles was increased. Because this test involved puncturing the bottles (to increase the pressure inside them), it is known as a destructive test.

The May, 2009, production run. Hood began a production run of Myoplex on May 14, 2009. Two days later, a bottle in that run failed the secure seal test, meaning that the bottle did not sustain its hermetic seal after the pressure inside the bottle was increased. Production therefore was suspended. After tentatively concluding that the problem likely was isolated, Hood resumed production. However, on May 18, 2009, another bottle failed the secure seal test. As a result, production was suspended again, and Hood conducted extensive investigation in accordance with its quality control protocols. By May 26, 2009, further secure seal testing indicated a failure rate of approximately seven percent. Hood utilized a nondestructive

test known as Taptone testing to try to isolate the problem, but it was unable to do so.

On May 27, 2009, Hood reported its preliminary results to Abbott, which responded that it would not accept bottles from the May, 2009, production run. Hood then conducted additional testing and investigation. In all, Hood performed secure seal tests on 5,994 bottles, with 538 failures (a nine percent failure rate). Hood also confirmed that it could not isolate the bottles that were potentially problematic from those that were not. Based on such results, Hood and Abbott agreed that none of the almost two million bottles from the May, 2009, production run could be marketed, and those bottles were destroyed.

Subsequent investigation revealed that the problem had to do with the bottle caps that Hood was using. Specifically, Hood discovered that the liner in the caps became more slippery over time, something that affected the amount of torque needed to seal the bottles properly. Because the production process used during the May, 2009, run did not take into account the particular age of the bottle caps that were being used at any given time, this meant that some bottle caps did not receive optimal torque when the bottles were capped.

Discussion. Whether the insurance policy here provided coverage is a legal question amenable to resolution on summary

judgment.  See <u>Cody</u> v. <u>Connecticut Gen. Life Ins. Co</u>., 387 Mass.
142, 146 (1982).

> The policy in question delineated its coverage as follows:

> "Subject to the terms, conditions, exclusions and
> limitations contained herein or endorsed hereon and in
> consideration of the premium paid, this 'policy' covers all
> risks of direct physical loss or damage to Insured Property
> at Insured Location(s), provided such physical loss or
> damage occurs during the Policy Period."

Allianz argues, as it did below, that based on this language,
actual property damage must occur before coverage is triggered
and that only such damage is covered by the policy.  It points
out that there was no evidence that even one Myoplex bottle lost
its hermetic seal or otherwise sustained physical damage (other
than those bottles that went through the secure seal testing)
before Hood made a business decision to destroy the May, 2009,
production run.  According to Allianz, the secure seal testing
showed, at most, a higher probability that bottles from the May,
2009, run later could become damaged in transit.[1]  Allianz

---

[1] As Allianz notes, there is material in the record that
raises doubts about the accuracy of secure seal testing as a
predictor of whether bottles of Myoplex would have lost their
hermetic seals during distribution and transport.  In fact,
after Hood's bottle supplier questioned the appropriateness of
using secure seal testing on noncarbonated beverages, Hood
stopped using such testing.  In addition, without questioning
the reasonableness of Hood's business decision acquiescing to
Abbott's refusal to accept bottles from the May, 2009,
production run, Allianz does maintain that the bottles in fact
legally and safely could have been released to the market.  For
this proposition, Allianz cites to material from the Food and

contends that, as a matter of law, a mere increased risk of future property damage is not itself covered by the policy here. See Tocci Bldg. Corp. v. Zurich Am. Ins. Co., 659 F. Supp. 2d 251, 259 (D. Mass. 2009) ("It is impossible to read the ['all risks'] insurance policy [at issue there] as providing coverage for 'risk' in the absence of a 'damage'").  See also HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co., 26 Mass. App. Ct. 374, 377 (1988) (defect in title to boat not covered by "all risks" policy because policy covered only "physical losses and damages").

In response, Hood argues in effect that special considerations should apply in cases that involve products designed for human consumption.[2]  In that context, Hood contends, the requisite property damage has occurred once doubts have been raised as to the product's fitness for that purpose and the

Drug Administration, National Food Lab (a private company that Hood hired to assess such issues), and Hood itself.

[2] Hood additionally argues that the policy was intended to cover increased risk of future physical loss or damage, not merely actual physical loss or damage that occurs within the policy period.  That argument, which the motion judge seems to have accepted, is at odds with the language quoted above.  The reference in that language to "all risks" being covered does not change that conclusion, because in this context, that reference signifies that the policy was intended to cover property damage whatever its cause (subject to exclusion).  See Audubon Hill S. Condominium Assn. v. Community Assn. Underwriters of America, Inc., 82 Mass. App. Ct. 461, 467 (2012) (analyzing whether insurance policy covers loss for "all risks" or only for "enumerated risks").

product thereby has lost value.  For this proposition, Hood cites to a string of cases from other jurisdictions.[3]  Allianz seeks to distinguish such cases based on the particular language of the insurance policies at issue in them, or the specific facts regarding what prevented the product's marketability.  Allianz has also cited to cases that rejected the legal proposition that Hood has put forward.[4]

Ultimately, we need not decide which side has the more persuasive argument on whether property damage occurred, because we agree with the motion judge that, in any event, any losses at issue here fell within an exclusion to the subject policy.  That

---

[3] See S. Wallace Edwards & Sons v. Cincinnati Ins. Co., 353 F.3d 367, 374-375 (4th Cir. 2003) (destruction of product due to safety concerns constitutes direct physical damage); Pillsbury Co. v. Underwriters of Lloyd's, London, 705 F. Supp. 1396, 1399-1400 (D. Minn. 1989) (insured's reasonable determination that product may not be fit for human consumption equates to direct physical loss); General Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 150-152 (Minn. Ct. App. 2001) (inability to lawfully distribute products because of failure to meet Food and Drug Administration regulations establishes direct physical loss).

[4] See Source Food Tech., Inc. v. United States Fid. & Guar. Co., 465 F.3d 834, 838 (8th Cir. 2006) ("To characterize [the insured's] inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word 'physical' meaningless").  See also Silgan Containers, LLC vs. National Union Fire Ins. Co. of Pittsburg, P.A., U.S. Dist. Ct., No. C 09-5971 RS, slip op. at 5-6 (N.D. Cal. Oct. 3, 2011), revd. and remanded on other grounds, 543 Fed. Appx. 635 (9th Cir. 2013) (decision to destroy cans of tomatoes because of a "'risk' that they would develop problems" is not "physical injury to tangible property").

policy included an express exclusion for "faulty workmanship, material, construction or design, from any cause." We agree with the motion judge that the plain language of this exclusion applies to the bottle cap liner issue, whether that problem be viewed as one of faulty "material" (the fact that the characteristics of the bottle cap liners changed as they aged), faulty "workmanship" (the failure by Hood to apply the correct torque), or faulty "design" (the fact that the bottling process did not take into account the changes to the liners as they aged).[5] When a company "assumes the obligation of completing [its work] in accordance with plans and specifications and fails to perform properly, [it] cannot recover under the all-risk policy for the cost of making good [its] faulty work." Allianz Ins. Co. v. Impero, 654 F. Supp. 16, 18 (E.D. Wash. 1986).[6]

---

[5] Hood argues that the exclusion does not apply because the defect here was not to its "product" but only to the product's "packaging." In this regard, it places great reliance on the fact that the agreement between Abbott and Hood defines the "product" that Hood is producing as the Myoplex itself, and not the packaged bottles of Myoplex. We agree with Allianz that this definition is beside the point in determining the scope of the relevant exclusion in the insurance contract between Hood and Allianz (which makes no use of the term "product"). Moreover, regardless of why Abbott and Hood chose to define the term "product" in a particular way in their contract packaging agreement (something on which the parties have shed no light), there is no doubt that Hood was producing bottled Myoplex for Abbott and that the bottling was an essential aspect of what Hood was producing.

[6] The exclusionary language at issue in Impero, excluding coverage for the "[c]ost of making good faulty or defective

Our analysis is not yet complete, because Hood additionally argues that even if the defective workmanship exclusion applies, it applies only to a limited extent. Specifically, Hood argues that the exclusion at most precludes coverage only for the bottle caps themselves and that other losses, such as the loss of the product inside the bottles, are covered. It bases this argument on the following language that precedes the language of the exclusion:

> "This 'policy' does not cover the following, but if physical loss or damage not otherwise excluded by this 'policy' to Insured Property at Insured Location(s) results, then only such resulting physical loss or damage is covered by this 'policy.'"

The quoted language raises some interpretive challenges, and the case law reveals the frustration that judges have felt in trying to make sense of provisions that include such language (commonly

---

workmanship, material, construction or design," was similar to the language that is before us. Most cases that have examined the scope of defective workmanship exclusions similar to the one before us have done so in the context of commercial general liability (CGL) policies. Such cases have concluded that by containing such an exclusion, the CGL policy was not intended to cover "the risk that an insured's product will not meet contractual standards." Thommes v. Milwaukee Mut. Ins. Co., 622 N.W.2d 155, 158-159 (Minn. Ct. App. 2001), affd, 641 N.W.2d 877 (Minn. 2002). See Hartford Acc. & Indem. Co. v. Pacific Mut. Life Ins. Co., 861 F.2d 250, 253 (10th Cir. 1988) (policy "is not intended to serve as a performance bond or a guaranty of goods or services"). Although a CGL policy is aimed at protecting against harm to third parties (and therefore presents a different context from an all-risks property damage policy), Hood has presented no convincing reason why the cases construing the scope of similarly worded defective workmanship exclusions should turn on the type of policy at issue.

known as "ensuing loss" or "resulting loss" provisions).[7] On its face, the language does not purport to reduce the breadth of the exclusion; it states only that losses that are not excluded are still covered, but only to that extent. At the same time, the language does appear to recognize that some kinds of "resulting physical loss[es] or damage" will be covered even though an exclusion precludes recovery for other losses. Notably, Hood does not argue that the resulting loss language sweeps back into coverage all losses caused by faulty workmanship and, in any event, such a reading would render the exclusion of no effect (something the parties are presumed not to have intended). Instead, the dispute is over what boundary the policy intended to draw between those property losses caused by faulty workmanship that are excluded from coverage, and those "resulting" losses that are not, and on which side of that boundary the losses here fall.

Existing cases characterize the scope of ensuing loss language in somewhat different respects. Some cases emphasize that such provisions provide coverage only with regard to property damage that is "wholly separate" from the damage directly caused by the excluded event without a break in the

---

[7] For example, one appellate court has commented that "[a]t first glance, the exclusion at issue here appears to be self-contradictory gibberish." Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co., 857 F.2d 286, 288 (5th Cir. 1988).

chain of causation.  Montefiore Med. Center v. American Protection Ins. Co., 226 F. Supp. 2d 470, 479 (S.D.N.Y. 2002) (claimed loss is not "wholly separate" where "collapse of the very portion of the building that [was] . . . designed defectively" constitutes damage).  Other cases hold that there can be coverage even as to damage that is not wholly separate and independently caused, where that damage is different in kind.  Dawson Farms, L.L.C. v. Millers Mut. Fire Ins. Co., 794 So. 2d 949, 950-953 (La. Ct. App. 2001) (condensation damage to crops stored in refrigerated facility covered as ensuing loss, even though cost to repair facility's faulty construction causing condensation was excluded).

Hood argues with significant force that it is entitled to the benefit of a lenient interpretation, because the relevant language at a minimum is ambiguous.  See generally Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 281-282 (1997) (when interpreting ambiguous exclusion to insurance policy, insured is particularly entitled to benefit of such construction).  In the end, however, such an argument does not aid Hood's cause.  On the particular facts of this case, Hood cannot prevail under any reasonable interpretation of the resulting loss language.  Even the case on which Hood places the greatest reliance recognizes that "damage that falls under the exclusion and the ensuing damage [that is covered] must be

separable events in that the damage and the ensuing loss must be different in kind, not just degree." Holden <u>vs</u>. Connex-Metalna, U.S. Dist. Ct., No. 98-3326, slip op. at 21 (E.D. La. Dec. 22, 2000), affd. in part, revd. in part on other grounds sub nom <u>Holden</u> v. <u>Connex-Metalna Mgmt. Consulting GmbH</u>, 302 F.3d 358 (5th Cir. 2002). Whatever else can be said about the case before us, it is not one where an excluded occurrence involving initial property damage led to other property damage of a different kind. To the extent that Hood suffered property damage potentially subject to coverage, that loss was directly caused by, and completely bound up in, the increased risk of future spoilage indicated by the secure seal testing. Both conceptually and practically, the losses entailed here cannot reasonably be characterized as "separable."[8] Instead, a problem with the bottle cap liners directly rendered the entire product

---

[8] Some argument can be made that "ensuing" losses are the same as "indirect" losses. See <u>Hanover New England Ins. Co.</u> v. <u>Smith</u>, 35 Mass. App. Ct. 417, 419 (1993). The policy before us covered only "direct" physical losses and it included a separate exclusion for "indirect or remote loss or damage," thus potentially rendering the debate about the scope of the ensuing loss provision beside the point. Allianz has not pressed this argument, and we decline to reach it.

unsaleable.  The loss of that product falls squarely within the exclusion language.[9]

<u>Judgment affirmed</u>.

---

[9] The judge also found that the losses here were excluded under the separate "latent defect" exclusion.  We need not reach that issue.  Similarly, we need not reach Allianz's argument that the judge erred in ruling that a separate "recall" exclusion was inapplicable.