447 So.2d 543 (1984)
ROUSTABOUTS, INC.
v.
Milton H. HAMER, Jr., et al. (Nobles Construction Company, Inc., Harry E. Nobles, Doyle M. Barnes and Anthony Newell).
No. 83 CA 0348.
Court of Appeal of Louisiana, First Circuit.
February 28, 1984.
*545 B.J. Rawls, Aycock, Home, Caldwell, Coleman & Duncan, Morgan City, for plaintiff.
Cary W. Vercher, Morgan City, for defendants.
Before LOTTINGER, EDWARDS and ALFORD, JJ.
ALFORD, Judge.
Plaintiff, Roustabouts, Inc., filed this suit against Milton H. Hamer, Jr., Doyle M. "Stick" Barnes, Anthony (Tony) Newell, Harry E. Nobles and Nobles Construction, Inc. In its petition, the plaintiff alleged that the defendants violated the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 et seq., (hereinafter sometimes referred to as the Trade Practice Act), in that they conspired to employ unfair methods of competition and unfair acts and practices which resulted in economic injury to plaintiff. While the defendants denied the plaintiff's allegations and filed a reconventional demand seeking their own damages based upon the Trade Practice Act, the trial court agreed with the plaintiff and awarded it $133,333.00 in actual damages and 25% attorney's fees. The defendants were cast in solido, and their reconventional demand was dismissed.
All of the defendants with the exception of Milton H. Hamer, Jr. have now perfected this appeal. On appeal, the appellants contend the trial judge committed five errors warranting the reversal of the judgment against them. However, an analysis of the transcript and evidence reveals that the decision below was correct and we therefore affirm at appellants' costs. In his lengthy written opinion, the trial judge stated several times that he had no doubt the defendants employed unfair practices to economically injure the plaintiff. Our reading of the transcript and review of the exhibits convinces us of the correctness of the trial judge's conclusions.
Hamer Industries, Inc. was incorporated on December 30, 1975. Milton H. Hamer, Sr. and his son Gregory J. Hamer were the only shareholders. Gregory J. Hamer was president, Milton H. Hamer, Sr. was secretary-treasurer and Doyle M. "Stick" Barnes was appointed vice-president on February 1, 1977. Being in the welding and fabrication business and serving the oil and gas industry, Hamer Industries frequently needed the services of roustabout-type personnel. Because of the need for this particular type of personnel, the Hamers decided that Hamer Industries, Inc. would spin-off a sister corporation to serve those in the area who needed roustabouts.
Accordingly, on May 12, 1977, the plaintiff company was incorporated. Gregory J. Hamer and Milton H. Hamer, Sr. each owned 35% of the stock of Roustabouts, Inc. and Doyle M. Barnes and Milton H. Hamer, Jr. each owned 15% of the stock. Initially, Gregory Hamer was president of the company, Doyle Barnes vice-president, and Milton Hamer, Sr. secretary-treasurer. Subsequently, Milton Hamer, Jr. was named president and Tony Newell was appointed operations manager. Although Doyle Barnes later sold his stock in Roustabouts, Inc., he remained vice-president and a director until January, 1980, when he went to work for Nobles Construction, Inc. In February, 1980, Milton Hamer, Jr. was fired as president of Roustabouts, Inc. and later accepted a job at Nobles Construction, Inc. Tony Newell also went to work for Nobles Construction about this time.
As noted above, the business of the plaintiff was to hire out roustabout personnel; use was made of these workers both on land and off-shore in the Gulf of Mexico. Because of the peculiar hours associated with this work, when the plaintiff's men were not working they were provided room and board for a nominal fee at a bunkhouse or "hotel" owned by the plaintiff. When a customer would call Roustabouts, Inc. looking for men, the plaintiff would dispatch *546 workers to the job with a "job ticket" used to keep track of the hours worked by the plaintiff's men. Later, when the men would return with the job tickets filled out, the plaintiff would bill the customer for services rendered.
For various reasons, the oil and gas industry in South Louisiana is frequently in need of welders and fabricators. Harry E. Nobles was a highly thought of welder and Doyle Barnes persuaded Nobles to come to work for Hamer Industries in January of 1978. Nobles agreed to come and brought some of is work with him. Often in need of roustabouts, Nobles would order men from Roustabouts and then Roustabouts would bill Hamer Industries, Inc.
The plaintiff's business was growing steadily and earning quite a nice return subsequent to its incorporation. Because of a number of matters, however, a sibling rivalry developed between Milton Hamer, Jr. and Gregory Hamer which began to interfere with the smooth operation of both plaintiff and Hamer Industries, Inc. At the same timethe spring and early summer of 1979Harry Nobles began thinking over the idea of forming his own company. He went to Barnes for advice and asked Barnes if he wanted to participate. Citing Nobles all the benefits associated with his job at Hamer Industries, Barnes said no. However, because of the continuing bitterness resulting from the sibling rivalry, Milton, Jr. and Barnes began to discuss the idea of going into business with Nobles in May of 1979.
Nobles Construction, Inc. was incorporated on June 12, 1979. Although the minutes of the first meeting indicate that Harry Nobles was the only shareholder, Milton Hamer, Jr. testified that the original stock issue was 400 shares to Harry Nobles, 800 shares to Doyle Barnes and 400 shares to Milton Hamer, Jr. In support of his testimony, plaintiff offered a copy of a stock certificate issued to Milton Hamer, Jr. for 400 shares on June 12, 1979. Although defendants disputed the authenticity of the certificate, an expert in handwriting analysis confirmed that the signature of Harry Nobles on the document was genuine. The evidence refuting Hamer, Jr.'s testimony on this point was not persuasive. Furthermore, Milton Hamer, Jr. testified that he later obtained a consulting contract in exchange for the surrender of his stock. This contract was introduced into evidence and its authenticity was also disputed; however, plaintiff's expert again confirmed the signatures on this document as genuine.
The record also reflects that immediately after the incorporation of Nobles Construction, and extending throughout the time period involved in the controversy, Barnes and Milton Hamer, Jr. made capital contribution to Nobles Construction, Inc. Later, Milton Hamer, Jr. and Barnes withdrew some of this money in the form of salary, and the exhibits also proved that Doyle Barnes was authorized to sign checks for Nobles Construction, Inc. as early as July 9, 1979. The cancelled checks introduced into evidence clearly support Milton Hamer, Jr.'s contention that he and Barnes would receive the same amount in payroll, and it is clear that from early in the life of Nobles Construction, Inc., Doyle Barnes and Milton Hamer, Jr. were not only shareholders, but were salaried employees of Nobles Construction, Inc.
There exists in the record other evidence indicating Milton Hamer, Jr. and Doyle Barnes were intimately involved in the day-to-day operations of Nobles Construction, Inc. For instance, Milton Hamer, Jr. testified that he and Doyle Barnes negotiated a lease for Nobles Construction, Inc. in October of 1979. A copy of the lease was introduced into evidence substantiating Hamer's testimony. Not only is Barnes a guarantor of the obligation incurred by Nobles Construction, but there exists a slot for the signature of Milton Hamer, Jr. also. Additionally, in December of 1979, Doyle Barnes opened a bank account at Patterson State Bank on behalf of Nobles Construction, Inc. and also made an application for a loan on behalf of Nobles Construction, Inc., putting his personal address on the application.
*547 These facts clearly demonstrate that Harry E. Nobles, Doyle Barnes, and Milton Hamer, Jr. conceived, planned and carried out a scheme to incorporate, capitalize, and manage Nobles Construction, Inc. Because Nobles Construction often employed roustabouts, business was taken away from the plaintiff and given to Nobles Construction, Inc. resulting in injury to the plaintiff at the hands of its own shareholders, directors and officers.
There is further evidence, moreover, that demonstrates the insidiousness of the plan to economically destroy the plaintiff for the benefit of Nobles Construction, Inc. This plan centered around three areas: 1) the use of the plaintiff's personnel and equipment by Nobles Construction, Inc. without paying for the services and products; 2) use of Hamer Industries' equipment by Nobles Construction; and 3) the use of Roustabouts, Inc. insurance to cover Nobles Construction employees. With respect to the first two, the trial judge summarized the evidence as follows:
Starting around July 1979 Stick Barnes, Tony Newell and Hamer, Jr. began a systematic practice whereby employees of Roustabouts would be sent to Nobles Construction, Inc. to do labor work for which Nobles would be paid for their services and Roustabouts would get nothing. At these times some of these men were housed and fed in the bunkhouse owned by Roustabouts and Roustabouts' vehicles were used to transport them to and from work. In June of 1979 Jackie Potts was working offshore at a Shell installation for Roustabouts, Inc. when he as approached by Harry Nobles, who informed him that he was starting his own company and was going to take over the job from Hamer Industries, Inc. and Roustabouts, Inc. Mr. Potts did not feel that he should transfer his allegiance from one company to the other, but upon being informed that Hamer, Jr. was involved in the situation and wanted him to do so, and upon inquiring about this, he made the switch and Potts became an employee of Nobles Construction, Inc. At that time there was Hamer Industries equipment that was used by Nobles Construction to continue the work of Roustabouts.
While Tony Newell was the general manager for Roustabouts, he became involved in the operation of Nobles Construction, Inc. He ordered certain equipment to be sent from Roustabouts' bunkhouse to the Nobles Construction, Inc. bunkhouse, and the evidence shows that he did much payroll and other work for Nobles Construction while purportedly working for Roustabouts. It was the custom of Roustabouts to send their employees out with a job ticket, however, while switching the men from Roustabouts to Nobles the Nobles men did not use the job tickets but Nobles received the benefits therefrom.
In short, Nobles Construction, Inc. would often use the plaintiff's personnel without paying for them. Additionally, the evidence suggests that until Nobles Construction, Inc. obtained its own insurance in November of 1979 (at a cost of approximately $25,000.00), claims made by Nobles Construction employees were run through plaintiff's insurance company. Thus, Nobles Construction effectively "used" the plaintiff's insurance without paying for it.
Of course, much of the evidence on the question of intent to injure plaintiff was circumstantial and required the trial court to weigh the credibility of the witnesses. In this respect, the trial judge had no doubt in his mind as to the result he should reach. He wrote that the evidence presented "clearly convinces this Court that Hamer, Jr., Stick Barnes, Tony Newell and Harry Nobles conspired not only to form their own corporation and to go into business in competition with Roustabouts, but to do so in an unfair and deceitful manner. While beefing up the new Nobles Construction Company, they were milking the business and some assets of Roustabouts, Inc., and for this Roustabouts, Inc. is entitled to recover damages." The lower court concluded: "There is no doubt in this Court's mind that a scheme did exist to take over a substantial part of the former employer's *548 business and to injure the business thereby. The people who started up Nobles Construction, Inc. wanted not only to go into competition with Roustabouts but to dilute Roustabouts' progress by using their men and list." We think the evidence supports the trial judge's conclusions.
As noted above, the appellants have posited five specifications of error on appeal and we shall analyze these in the order presented in their brief. In the first issue presented to the court, the appellants argue that the provisions of the Unfair Trade Practices and Consumer Protection Law are inapplicable to this case. We disagree.
The Louisiana Unfair Trade Practices and Consumer Protection Law declares unlawful unfair methods of competition and unfair acts or practices in the conduct of any trade or commerce. LSA-R.S. 51:1405 A. Private actions are permitted by any person who suffers any ascertainable loss as a result of the use by another person of an unfair practice, and if the actions are successful, the trial judge shall award reasonable attorney's fees to the prevailing party. LSA-R.S. 51:1409 A. Of importance is the fact that the term person is defined in LSA-R.S. 51:1402(8) to include corporations as well as natural persons.
Essentially, the appellants argue that in order for the Trade Practices Act to apply, the act or practice complained of must be one that effects broad consumer interest. However, as we stated in Guste v. Demars, 330 So.2d 123, 125 (La.App. 1st Cir.1976):
The substantive prohibition of the Unfair Trade Practices and Consumer Protection Law is broad and does not specify particular violations. La.R.S. 51:1405(A) declares that:
"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."
The language of this section tracks closely that of the Federal statute, 15 U.S.C. Section 45(a). Because of the variety of possible unfair and deceptive practices, the Federal statute was intentionally broadly written, leaving the determination of individual violations to the Commission and the courts. Our legislature has expressed a similar intention in patterning our law so closely on the Federal statute.
It should be noted that the private right of action in the Louisiana law is not provided for in the Federal scheme. But more importantly, consistent with the definition of person cited above, it has been held that the language of LSA-R.S. 51:1409 A confers the private right of action on both consumers and business competitors. Morris v. Rental Tools, Inc., 435 So.2d 528 (La.App. 5th Cir.1983). Furthermore, it has been stated that a practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers and consumers include business competitors. Coffey v. Peoples Mortgage & Loan of Shreveport, Inc., 408 So.2d 1153 (La.App. 2nd Cir.1981); Moore v. Goodyear Tire and Rubber Co., 364 So.2d 630 (La.App. 2nd Cir.1978); Morris, 435 So.2d at 532; See also, National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980). Admittedly, the definition of what may constitute an unfair act or practice is broad and subjective. Thus, it is best that the determination of what may amount to an unfair act or practice remain the province of the courts applied on a case by case basis. Only in that way may the many harms sought to be proscribed by the act be prevented. As such, the appellants' argument that all business consumers or competitors should, ipso facto, be excluded from bringing an action under the act finds rejection in the jurisprudence and in the common sense interpretation of the statutes. Thus, we find the trial judge was correct in the application of the Trade Practices Act to the facts.
The appellants next argue that the plaintiff failed to prove its case by a preponderance of the evidence. What do the facts of record show? While still either officers, shareholders, directors, or employees *549 of the plaintiff corporation, Milton Hamer, Jr., Doyle Barnes, and Tony Newell, in combination with Harry Nobles, engaged in conduct which was intentionally designed to injure the plaintiff. The exhibits demonstrated beyond equivocation that Hamer, Jr. and Barnes contributed substantial amounts of capital and time to Nobles Construction, Inc. while still shareholders or directors in a company which was often in direct competition with Nobles. More perniciously, the evidence clearly proved that Hamer, Jr., Barnes, Newell and Nobles knew that the plaintiff's employees were being used by Nobles Construction without compensation to the plaintiff. The plaintiff's bunkhouse was often used by Nobles' employees when these workers were not off-shore, and when they were off-shore and suffered an injury, the employee would be taken care of by the plaintiff's insurance policy.
Although the existence of a conspiracy to economically injure another company is often a difficult charge to substantiate, especially where the different parts in the plan are played by several people, in the case sub judice the trial judge had "no doubt" after weighing the credibility of the witnesses that the appellants conspired to do harm to the plaintiff. We think the actions of the appellants exhibited a clear intent to decimate the plaintiff's business for their own gain, and that the appellants engaged in basic business dishonesty of an unscrupulous and underhanded nature. The lower court felt the facts of the conspiracy were proven by a preponderance of the evidence and we see no manifest error in his conclusion. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The appellants also argue that the trial judge erred when he dismissed their reconventional demand with prejudice. When the defendants answered plaintiff's petition, they filed a reconventional demand of their own based upon the Trade Practices Act. Essentially, the defendants argued that Milton Hamer, Sr. and Gregory Hamer engaged in unfair competition which caused the defendants to lose work and suffer injury. The trial judge dismissed defendants' reconventional demand as he obviously felt that defendants had not proven their allegations, or whatever allegations they did prove did not amount to behavior proscribed by the Trade Practices Act. We agree.
The only testimony offered in support of defendants' reconventional demand was that of Milton Hamer, Sr. It should be noted that Milton Hamer, Sr. and Gregory Hamer had instituted another suit against Milton Hamer, Jr. based upon the same facts sometime around the date the suit which is the subject of this appeal was filed. When the present suit was filed in June of 1980, the population of the small town of Morgan City, where the principals live, became intensely interested in the "inside story." At one point, Milton Hamer, Sr. testified that he quit going to the post office because of local curiousity over the court action. It is with the knowledge of this "Dallas" type atmosphere that we must weigh the correctness of the action taken by the lower court in dismissing the defendants' reconventional demand.
Defendants allege that Milton Hamer, Sr. damaged Nobles Construction, Inc. when he talked to several oil company executives about the lawsuits, and defendants also claim that because Hamer, Sr. interfered with Nobles Constructions' relations at various lending institutions, Nobles Construction was unable to purchase an entity called Ramos Oilfield Service. Although Milton Hamer, Sr. was questioned extensively on both aspects of defendants' claim, apparently the trial judge was never able to connect any harm to the defendants with the actions of Hamer, Sr. In the first place, Milton Hamer, Sr. only talked to two or three executives: one at Shell Oil Company, another at Kerr-McGee, and maybe (Hamer, Sr. was uncertain), a third at Texaco Oil Company. All of these conversations occurred after the lawsuits had been filed and the internal bickering of the Hamer family had become the talk of the town. In each instance, Hamer, Sr. simply told the executives what was the nature of the lawsuits, and why he had instituted the *550 legal action. He did not say anything that was not public knowledge or was not contained in the petitions. As a matter of fact, Hamer, Sr. testified that he never mentioned any names with the exception of his son and Nobles Construction, Inc. With respect to the purchase of Ramos Oilfield Services, the only thing proven at trial was not that Hamer, Sr. blocked this sale, but that one of the seller's backed out of the deal because he wanted to sell all of the stock, something to which Doyle Barnes would not consent.
In summary, it is clear to us, as it must have been to the trial judge, that whatever harm was suffered by the defendants was more the result of small town gossip and a desire by local businessmen to stay out of the fight, than it was the actions of Milton Hamer, Sr. or Gregory Hamer. The defendants cannot now be heard to complain because the plaintiff filed a meritorious lawsuit that turned out to be entertaining to the people of Morgan City. As such, the trial judge was correct in dismissing the defendants' reconventional demand.
The final two errors alleged by the defendants involve the award of damages and the assessment of attorney's fees by the trial court. Appellants claim that the damages awarded to the plaintiff were excessive and erroneous, and that the 25% attorney's fees awarded to plaintiff were also unwarranted. LSA-R.S. 51:1409 A states that any person who suffers an ascertainable loss of money as a result of an unfair act or practice may bring an action to recover actual damages. Furthermore, this same statute also provides that in the event damages are awarded, the court shall award to the person bringing the action reasonable attorney's fees.
The trial court arrived at the figure of damages by analyzing the plaintiff's tax returns for the years 1977-78, 1978-79, and 1979-80. These exhibits reflect a steady increase in sales and in earnings for the plaintiff in fiscal years 1977 and 1978 and a significant decrease for fiscal year 1979. The plaintiff's percentage of profits to sales in 1977 was 6.67 percent, in 1978 it was 14.99 percent, but in 1979 it was only 2.29 percent. Other business factors which might account for the decrease in profits, such as uncollected debts, were not shown to exist. So, after making appropriate deductions for increases in outlay for salaries and taxes, the trial judge reached the figure of $133,333.00 and assessed this as damages. We should note that the figure assessed as damages probably reflects as accurate an account of the overall damage inflicted upon the plaintiff that was available for the lower courts consideration. Although in their brief on appeal the defendants posit several figures which they claim are more reasonable, none of the numbers cited by the defendants take into account the true damage done to the plaintiff by the defendants acts, and furthermore, the figure assessed by the trial court most accurately reflects actual loss. Thus, given the evidence before the trial judge, we think the $133,333.00 does not represent an abuse of discretion. Caldwell Country Club v. Department of Transportation and Development, 438 So.2d 723 (La.App. 2nd Cir.1983); Martin v. Roberts, 331 So.2d 541 (La.App. 1st Cir.1976).
Finally, the appellants argue that the 25% attorney's fees awarded to the plaintiff were excessive. While we think 25% may be on the high end of the scale, we also think it was justified given the nature of this case. The question, of course, is one of reasonableness, and that determination should be made in light of several factors: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the amount involved and the results obtained; (3) the time limitations imposed by the case; (4) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (5) the importance of the litigation. Contrary to the defendants' assertions, we think the record clearly shows that each of these factors was extant in this case and combine to make the 25% figure reasonable. Given *551 the nature of this litigation, we are not left with the definite and firm conviction that the 25% fee was in excess of reasonableness and we reject defendants' allegations in this respect. See, Louisiana State Bar Association, Code of Professional Responsibility, DR 2-106.
Because we have found no errors in the trial court's decision, we affirm the judgment below at appellants' costs.
AFFIRMED.