# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-55

**VESTA HALAY JOHNSTON, ET AL**

**VERSUS**

**SUSAN HALAY VINCENT, ET AL**

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 2015-4153
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

************

## SYLVIA R. COOKS
### JUDGE
************

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Candyce G. Perret, Judges.

**REVERSED AND REMANDED.**

J. Michael Veron
J. Rock Palermo, III
Turner D. Brumby
Veron, Bice, Palermo & Wilson, LLC
721 Kirby Street
Lake Charles, LA 70601
(337) 310-1600
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Vesta Halay Johnston, et al.

Hunter W. Lundy
Rudie R. Soileau, Jr.
501 Broad Street
Lake Charles, LA 70601
(337) 439-0707
COUNSEL FOR DEFENDANT/APPELLEE:
    Susan Halay Vincent

**James D. Cain, Jr.**
**Thomas P. Leblanc**
**Loftin, Cain & Leblanc, LLC**
**113 Dr. Michael DeBakey Drive**
**Lake Charles, LA 70601**
**(337) 310-4300**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Susan Halay Vincent**

**COOKS, Judge.**

This matter arose over a family dispute involving the long-time family business, Lake Charles Rubber & Gasket, Co., L.L.C. (hereafter LCR&G). LCR&G was started in 1957 by Mike Halay, who was the father of three daughters, Susan Halay Vincent, Vesta Halay Johnston and Kathryn Halay Heinen. In 1991, Mr. Halay promoted his son-in-law, Bryan Vincent, to the position of general manager of LCR&G. Mr. Halay remained president and CEO of the company until his death in 2004.

Mr. Halay's three daughters inherited his estate, including LCR&G, in equal one-third shares. The company was reorganized on June 2, 2005, and the three sisters became managing members. There was a four-member board of managers, the three sisters and Bryan, who was also general manager and in charge of the day-to-day operations of the company. Eventually in 2012, Vesta and Kathy agreed to reconfigure the board of managers to remove Bryan from that board, leaving just the three sisters on the board of managers. In November 2013, Susan filed suit against Vesta and Kathy, claiming they were interfering with Bryan's management of the company. Little to nothing occurred with the action, as the sisters began discussing ways to end their relationship. Bryan was later terminated from LCR&G on September 25, 2014.

The same day as Bryan's termination, Susan filed a petition to dissolve LCR&G and for the company to be placed into receivership. The receivership was soon dissolved and formal mediation was ordered by the trial court. On October 14, 2014, the court-ordered mediation occurred and Susan and Bryan offered to sell their ownership interests in LCR&G (and three other smaller rubber and gasket companies) to Vesta and Kathy for $8.615 million dollars. The offer was accepted, and the parties executed a Mediation Term Sheet with Vesta and Kathy agreeing to purchase Susan's ownership interest. The Mediation Term Sheet called for the

parties to execute closing documents for sale within ninety days of the mediation date. The Act of Sale was executed on January 8, 2015, wherein Vesta and Kathy acquired Susan's ownership interest in LCR&G. The Act of Sale provided that the effective date of the sale was October 14, 2014.

The evening following the signing of the Mediation Term Sheet, Susan and Bryan hosted a party at their lake house with employees of LCR&G for the purpose of offering them employment in a new, similar business they were preparing to form. In a matter of two to three weeks following the signing of the Mediation Term Sheet, but prior to the execution of the Act of Sale, Susan and Bryan opened a new, competing business, Gulf Coast Rubber & Gasket, LLC (hereafter GCR&G). It opened for business on November 3, 2014. Several employees formerly with LCR&G were hired by GCR&G. Bryan and Susan maintained the Mediation Term Sheet they signed did not contain any non-competition or non-solicitation agreements imposing any obligations on Bryan or Susan. They also maintained no such restrictions were even discussed during the mediation.

Shortly after acquiring Susan's ownership interest, Vesta and Kathy began negotiating to separate from one another. Eventually, Vesta became sole owner of LCR&G, while Kathy became sole owner of other companies the sisters owned.

Vesta and LCR&G (hereafter Plaintiffs) filed suit on October 14, 2015, for breach of contract, unfair trade practices, and theft of trade secrets allegedly arising from the taking and use of vital business information belonging to LCR&G. Named as defendants were Susan Vincent, Bryan Vincent, Moby Goodwin (a principal in GCR&G), and GCR&G (hereafter Defendants). It was specifically alleged that massive amounts of proprietary information and trade secrets of LCR&G were taken and used to start GCR&G. Plaintiffs maintained this information allowed GCR&G to open in a matter of weeks rather than the years it would have taken to compile the information on their own. This, they maintained, allowed GCR&G to compete

4

successfully for major contracts with local petrochemical plants long before they otherwise could have.

Immediately upon filing suit, Plaintiffs sought an expedited contradictory hearing to consider whether an order should be issued to preserve evidence and quarantine electronic devices until LCR&G's computer forensic expert was allowed unimpeded access to copy all data and metadata. Defendants did not agree that a quarantine of their electronic devices was warranted. Eventually, the parties agreed upon the Preservation Order and a consent judgment was signed on November 18, 2015. The Preservation Order required Defendants to create and preserve a digital image of all data existing at the time of the order. Defendants retained Kiersted Systems to create the image.

A Motion for Sanctions was filed by Plaintiffs on June 30, 2016, alleging Defendants violated the Preservation Order. A hearing was held after which the trial court denied the motion. Plaintiffs filed a motion for reconsideration or rehearing of the motion for sanctions. Defendants opposed the motion and filed a motion to strike and/or dismiss the motion for sanctions and the motion for reconsideration was eventually denied in a later hearing. Plaintiffs then applied for writs from this court, wherein this court denied writs finding the trial court did not abuse its discretion in denying the motion for sanctions. *Johnston v. Vincent*, 17-391 (La.App. 3 Cir. 12/13/17), 258 So.3d 687.

A bench trial was held in the matter commencing on January 16, 2018. There were twenty-six days of testimony taken over a six-month period, with the Plaintiffs resting on June 21, 2018. It became clear that GCR&G relied on files that had LCR&G contracts, customer information, pricing and cost information, vendor information and other proprietary information. Brian Wilson, Plaintiffs' computer forensics expert, testified it was "conclusive that 14,532 electronic business files belonging to Lake Charles Rubber & Gasket are in the possession of the employees

5

and owners of lake - - of Gulf Coast Rubber and Gasket." He further concluded employees of GCR&G "used a variety of means to copy [LCR&G] business files, including thumb drives, Dropbox, and Google Drive." Mr. Wilson also testified in his opinion the Defendants did not comply with the preservation order.

Following the presentation of Plaintiffs' case, the four defendants immediately moved for involuntary dismissal under La.Code Civ.P. art. 1672(B). After briefing and argument on the motion for involuntary dismissal, on August 30, 2018, the trial court granted Defendants' motion in part, stating as follows:

(1) Plaintiffs' claims of defamation are dismissed as to defendant Moby Goodwin, with prejudice;

(2) Plaintiffs' claims of violations of the Louisiana Unfair Sales Law are dismissed as to all defendants, with prejudice;

(3) Plaintiffs' claims of breach of contract are dismissed as to defendants Susan Vincent and Martin Bryan Vincent, with prejudice;

(4) Plaintiffs' claims of violation of the Louisiana Uniform Trade Secrets Act and the Louisiana Unfair Trade Practices Act are dismissed as to defendants Susan Vincent and Moby Goodwin, with prejudice; and

(5) Plaintiff's claim for treble damages pursuant to the Louisiana Unfair Trade Practices Act are dismissed as to all defendants, with prejudice.

In its oral reasons for judgment, the trial court made the following comments regarding Susan Vincent's involvement in the proceedings:

> The more complex issue had to do with Susan Vincent, even though it is noted that there was nothing in the mediation other than the sale of her interest. Subsequent to that, the basis for the breach [of contract] appears to be a meeting at the lake house [of the Vincents], as its been referred to, in which Mr. Bryan Vincent recruited a number of [LCR&G] employees to work with him in the upcoming new business.

> Susan Vincent, being married to Bryan, or being home, or serving, or whatever was her involvement with that, but in the history it showed that she has not been involved in Lake Charles Rubber & Gasket. She's not been aggressively or actively involved other than financial support with regard to Gulf Coast Rubber & Gasket, and then subsequently when she signed the Act of Sale which then for the very first time referenced the goodwill of which the meeting which being complained of has already occurred which the Court finds that to be somewhat circumspect, but would find that, if there was any evidence

6

of goodwill that was violated, I do believe that the defendant's arguments of personal goodwill are definitive and I have not seen any action that she has taken to the detriment of Lake Charles Rubber & Gasket. So, therefore, she would not be maintained under a breach of contract as indicated.

Plaintiffs filed an application for supervisory writs with this court to review those rulings. On September 14, 2018, this court reversed the trial court's denial of the claims for damages against GCR&G and Bryan Vincent for violations of the Louisiana Unfair Trade Practices Act (LUTPA) and the Louisiana Uniform Trade Secrets Act (LUTSA). We declined to undertake a supervisory review of the dismissal of Susan Vincent because we determined Plaintiffs had an adequate remedy by appeal to review that judgment. *Johnston v. Vincent*, 18-691 (La.App. 3 Cir. 9/4/18) (unpublished writ decision).

Trial subsequently resumed on the claims against Bryan Vincent and GCR&G that were not dismissed. In the interim, Plaintiffs timely appealed the judgment dismissing their claims against Susan Vincent, which is the matter currently before this court. In this appeal, Plaintiffs maintain the trial court committed legal error in dismissing the claims against Susan Vincent for breach of contract, unfair trade practices, and theft of trade secrets under La.Code Civ.P. art. 1672(B).

## ANALYSIS

The question of whether a proceeding may be the subject of a motion for involuntary dismissal is governed by the provisions of La.Code Civ.P. art. 1672(B), which state:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

7

Defendants assert the appropriate standard of review applicable to the grant of a motion for involuntary dismissal is the manifest error standard. In *Touchet v. Hampton*, 06-1120, pp. 3-4 (La.App. 3 Cir. 2/7/07), 950 So.2d 895, 898, we stated:

> "The trial court is granted much discretion in determining whether to grant an involuntary dismissal." *Boone v. Reese*, 04-979, p. 5 (La.App. 3 Cir. 12/8/04), 889 So.2d 435, 438 (citing *Kite v. Carter*, 03-378 (La.App. 3 Cir. 10/1/03), 856 So.2d 1271). "The trial court's grant of an involuntary dismissal is proper if, after weighing and evaluating all of the evidence that has been presented by the plaintiff, the trial court determines that the plaintiff has failed to prove his claim by a preponderance of the evidence." *Id.* at 439. The granting of an involuntary dismissal is reviewed under the manifest error standard of review. *Id.*

Despite this, Plaintiffs maintain the appropriate standard of review in this case is de novo, noting the law is clear that when "the trial court committed legal error that interdicted the fact finding process . . ., we must conduct a de novo review of the record to determine whether there is liability[.]" *Touchet v. Hampton*, 08-833, p. 4 (La.App. 3 Cir. 12/11/08), 1 So.3d 729, 732, *writ denied*, 09-76 (La. 3/27/09), 5 So.3d 141. Moreover, Plaintiffs note when a claim is based on contract terms that are clear, "the trial court is bound to give legal effect to them as written." *Vernon Parish Police Jury v. Buckley*, 00-45, p. 6 (La.App. 3 Cir. 11/2/00), 776 So.2d 17, 21. Plaintiffs note the interpretation of contracts is a question of law subject to de novo review. *Wooley v. Lucksinger*, 09-571 (La. 4/1/11), 61 So.3d 507; *Whitbeck v. Champagne*, 14-245 (La.App. 3 Cir. 10/1/14), 149 So.3d 372. Plaintiffs maintain if the law was properly applied by the trial court, it would have dictated the denial of the motion for involuntary dismissal with respect to the claims against Susan. Thus, they argue the trial court's dismissal is legal error.

In brief, Plaintiffs maintain the trial court committed "significant legal errors in dismissing the breach of contract claims against Susan Vincent." First, Plaintiffs contend the trial court mischaracterized its claims by stating the Vincents' meeting with LCR&G employees on October 15, 2014, was the basis for the breach of

contract claim. Plaintiffs maintain this recruitment of employees was only a small part of the breach of contract claim. The much larger part was the taking and use of LCR&G's proprietary information and trade secrets that was included in what was sold by Susan to her sisters for $3.2 million. Plaintiffs maintain the trial court committed legal error in not addressing this main part of Plaintiffs' claim.

Susan acknowledges that GCR&G "came to be in possession of LCR[&]G data." However, for purposes of this appeal, Susan maintains there is "no evidence to suggest Susan undertook any action or failed to undertake any action to cause her to be guilty of a *taking*, or . . . a *theft* of information from LCR[&]G." (emphasis added) Susan points to her testimony that she had little to no meaningful participation in the day-to-day operations and was merely a "passive owner whose participation was primarily through attendance at the annual owner's meetings of the company." Susan maintains she had no knowledge of LCR&G's systems, nor any opportunity to take, copy or download any of LCR&G's information. As further support of this contention, Susan points to Vesta's testimony wherein she stated she didn't believe "Susan went down there and physically removed information herself." Likewise, Susan asserted she was a "passive investor in [GCR&G], having no active role in [its] day-to-day operations."

Admittedly, the testimony and record are not equivocal on how actively involved Susan was in LCR&G before the sale, how involved she was in the taking and use of LCR&G's data and how active she was in the formation and running of GCR&G. However, we do find the record clearly establishes Susan was more than simply a "passive owner" during the time periods in question.

In the period before the sale of Susan's interest in LCR&G to her sisters, Susan filed suit against them on two separate occasions. Plaintiffs also introduced at trial the following text message sent to two LCR&G account managers disparaging her sisters and requesting they take action against them:

9

> We are all suffering as a result of Vesta's unaddressed mental problems. Her attorneys are in this for the $$$. Kathy who has her own set of "issues" has sided with Vesta, so she doesn't have to do anything. Someone has got to "hit the bully in the nose"!!! Good luck!!!

Such vindictiveness toward her sisters and imploring of others to "hit the bully in the nose" contradicts the trial court's finding that Susan was not "active" or "aggressive" in the actions at issue in this matter.

Susan's testimony also established her knowledge that she and Bryan were planning on starting a new company that would compete closely with LCR&G:

> Q. And is it your belief that [Bryan] had not been talking to [LCR&G employees] for quite some time before all of this about a new company?
>
> A. No.
>
> . . . .
>
> Q. Is it your testimony here in this court that there were . . . no alternative plans to start a new business and compete with [LCR&G] before the night of October 14, 2014?
>
> A. No.

Susan testified about her and Bryan's desire "to be able to remain in the industrial rubber business," which envisioned the starting of a new business that would logically have to compete with LGR&G. Thus, she clearly was aware of their plans to start a new, competing company with LCR&G. She also was involved in the planning and hosting of the party at her lake house to recruit LCR&G employees. This contradicts the trial court's finding in his oral reasons for judgment that Susan had not been "actively involved other than financial support with regard to [GCR&G]."

While the record would seem to indicate Susan did not directly participate in the physical "taking" of LCR&G data, the testimony did establish Susan was aware of the taking and continued use of LCR&G data. Susan herself testified as follows:

> Q. Were you aware when the suit was filed that the plaintiffs were claiming that you had taken their proprietary information?

A. Yes.

Q. Okay. Did you ever ask in the two years and three months, since you have known that was the basis for the lawsuit, whether the company that you have a major interest in did in fact have any proprietary information that came from Lake Charles Rubber & Gasket?

A. I guess I probably asked.

Q. Who did you ask?

A. Bryan.

Q. And what did he tell you?

A. I really don't understand it. I really don't understand if we do or we don't.

Q. You don't know whether he said yes or no?

A. He said yes.

. . . .

Q. Let me ask my question a little better. Have you done anything since this lawsuit started to stop Gulf Coast Rubber & Gasket from using the proprietary information that your husband said they had?

A. No.

Q. Have you done anything since this lawsuit started to try and get Gulf Coast Rubber & Gasket to return that information to Lake Charles Rubber & Gasket?

A. No.

Susan also acknowledged she was aware of two suits being filed against her by Vesta for unfair trade practices. She testified, although she was aware of the lawsuits, she had not taken any steps to stop GCR&G from using any of the business information found on their computers from LCR&G.

Plaintiff points out that anyone who conspires in the commission of an unfair trade practice is liable *in solido* for the resulting damages. The court in *Camp, Dresser & McKee, Inc. v. Steimle and Associates, Inc.*, 94-547, p. 7 (La.App. 5 Cir. 2/15/95), 652 So.2d 44, 48, stated:

11

However, we agree with the First Circuit Court of Appeal that anyone who conspires to injure a party's competitor in violation of La.R.S. 51:1401 et seq. is liable in solido with that party. See: *Strahan v. Louisiana*, [93-374] (La.App. 1st Cir. 8/25/94), 645 So.2d 1162; *Roustabouts, Inc. v. Hamer*, 447 So.2d 543 (La.App. 1st Cir.1984).

The above cited testimony establishes Susan's knowledge that GCR&G retained and used LCR&G's data to her continued financial benefit. Thus, whether Susan physically took any of the data, she would still be solidarily liable with her husband and GCR&G for any violations of LUTPA and LUTSA.

Susan argues there was no *taking* in the manner put forward by Plaintiffs. Specifically, she argues the LCR&G information came from "[e]lectronic copies of data accumulated during decades of employment at LCRG by Bryan and Steve Haymon [which] exist[ed] on old computers or remote data storage sites." This argument ignores the uncontroverted evidence that GCR&G was in possession of [through whatever means acquired] and *continually used*, both before and after suit was filed, business files, customer lists, pricing, cost and vendor information, which took decades for LCR&G to accumulate. Even if Susan were not physically involved in the taking of this proprietary data, she is solidarily liable under LUTPA and LUTSA for conspiracy in its continued use. The trial court's dismissal of Susan without addressing LUTPA and LUTSA was reversible legal error. Our review of the record establishes Susan was aware of the continued use of LCR&G's proprietary data and trade secrets, but did not stop that use while continuing to financially benefit from that course of action.

The trial court also committed legal error by misinterpreting the mediation term sheet. The trial court stated in its oral reasons "there was nothing in the mediation other than the sale of [Susan's] interest." Plaintiffs strenuously maintain the trial court was legally incorrect in its apparent finding that the sale of Susan's interest in LCR&G did not include the intangible asset of "goodwill." They note Defendants acknowledged at trial the inclusion of goodwill in the sale on several

12

occasions, including Susan conceding the Act of Sale specified the "seller's interest is transferred such that the company remains a going concern, including the goodwill." Bryan Vincent also acknowledged the sale of goodwill in his deposition testimony:

Q. Okay. So is it fair for anyone to assume that your wife sold everything, specifically including the goodwill?

A. Yes.

Q. There's nothing in this document that says you retained anything associated with [LCR&G] correct?

A. No.

Q. Is that correct?

A. I think that's correct, yes.

. . . .

Q. Well, by selling everything that Ms. Vincent owned in [LCR&G], wouldn't that mean that if the two of you wanted to open a competing business, you would have to start from scratch; you couldn't use any of what you sold to them?

A. If we sold it to them and it wasn't included in the sale, then . . . that would be fair that we wouldn't use it.

Plaintiffs note that goodwill can be bought and sold, as the Louisiana Supreme Court in *Succession of Conway*, 41 So.2d 729, 732 (La. 1949), set forth:

The good will of a partnership is as much a[n] asset as the fixtures and any other tangible property belonging to the partnership. It is property, recognized and protected by law as such, and capable of sale and transfer from one owner to another. (citations omitted)

Further, the supreme court noted "unless good will is expressly excluded in an agreement [to sell], it is included." *Id.* at 733. Thus, Plaintiffs maintain the trial court's conclusion that the mediation term sheet did not include "goodwill" was contrary to stated law. It is undisputed that the mediation term sheet did not expressly exclude goodwill. Moreover, the Act of Sale specifically included goodwill. Plaintiffs contend if the law was correctly applied, it would have required

the trial court to find the taking of LCR&G's proprietary information, trade secrets and employees was a breach of contract. This constituted reversible legal error.

Plaintiffs also maintain the trial court committed legal error in finding the second contract signed by Susan, the Act of Sale, was not binding. While not elaborating, in its oral reasons for judgment, the trial court stated the second contract was "somewhat circumspect." As noted earlier, the Act of Sale, signed on January 8, 2015, but with an effective date of October 14, 2014, specifically "include[ed] the goodwill." The trial court's refusal to apply the Act of Sale because it was signed after the October 15, 2014 recruitment meeting at the Vincent's lake house, enabled it to find the conveyance of goodwill did not retroactively apply to the meeting. However, as stated earlier, the effective date of the Act of Sale was October 14, 2015. Plaintiffs maintain this amounts to a refusal by the trial court to enforce the parties' agreed-upon effective date; and, as such, constitutes reversible legal error in failing to enforce the plain terms of the contract as written by the parties. *See Wooley*, 61 So.3d 507.

Plaintiffs also point out that the trial court maintained the claims for unfair trade practices and theft of trade secrets against Bryan Vincent and GCR&G. To do so, it had to find that proprietary information and trade secrets were, in fact, taken from LCR&G. It is difficult to reconcile this finding with the trial court's subsequent dismissal of the breach of contract claims against Susan. If Susan's company violated LUFTA and LUTSA by taking and using LCR&G's proprietary information and trade secrets, it follows that Susan breached the contracts she signed *agreeing to sell all her rights to that information*.

The trial court relied on a distinction between "personal goodwill" and "enterprise goodwill" in reaching its decision. The trial court specifically found that Susan's "arguments of personal goodwill versus enterprise goodwill are definitive and I have not seen any action that she has taken to the detriment of Lake Charles

Rubber & Gasket." As we noted previously, we find it difficult to accept that Susan's turning a blind eye to her company's continued use of LCR&G's proprietary data was not to the detriment of LCR&G. Moreover, the trial court did not explain how the distinction of personal versus enterprise goodwill could serve to legally relieve Susan of her contractual obligations. As set forth, in return for a large sum of money, Susan sold all of her rights to LCR&G. Neither the Mediation Term Sheet nor the Act of Sale addressed any distinction between personal or enterprise goodwill, nor provided any exclusion for any type of goodwill. We find any distinction by the trial court between enterprise and personal goodwill does not serve to allow Susan to breach the signed contracts freely entered into, by knowingly allowing her new company, GCR&G, to take and use LCR&G's proprietary information and trade secrets. The record is clear GCR&G continued, with Susan's knowledge, to use LCR&G's proprietary data long after the Act of Sale was signed on January 8, 2015, even regardless of the stated, earlier effective date of October 15, 2014. This is a clear violation of the contracts entered into by the parties and the trial court erred in finding Susan did not breach the contracts at issue on this matter. For this reason, as well, the involuntary dismissal was improperly granted as to Susan.

## DECREE

For the reasons set forth above, this court reverses the trial court's judgment granting Defendants' request for involuntary dismissal of Plaintiffs' action as to Susan Vincent. We remand the matter for the receipt of Defendants' evidence and a decision on the entire record. *Taylor v. Tommie's Gaming*, 04-2254 (La. 05/24/05), 902 So.2d 380. Costs of this appeal are to be paid by Defendants.

**REVERSED AND REMANDED.**